IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ECUBE LABS CO., | ) | Case No. 25-43950 |
| | ) | |
| Debtor. | ) | Judge Mark X. Mullin |
| | ) | |

**OMNIBUS OBJECTION OF WASTE CONNECTIONS PARTIES TO (I) DEBTOR'S MOTION TO ASSUME HAULER AGREEMENTS AND PAY CURE AMOUNTS AND (II) DEBTOR'S MOTION TO OBTAIN SECURED POST-PETITION DIP FINANCING**

El Paso Disposal, LP, Waste Connections of Texas, LLC, Waste Connections Lone Star, Inc., and Waste Connections US, Inc. (collectively, the "Waste Connections Parties") file this omnibus objection ("Omnibus Objection") to *Debtor's Omnibus Motion for Entry of Order (I) Authorizing the Assumption of Eight Hauler Agreements, and (II) Establish [sic] the Cure Amounts Associated with the Eight Hauler Agreements* ("Assumption Motion") (Docket No. 47) and *Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to Obtain Secured Post-Petition Financing, (II) Scheduling a Final Haring [sic], and (III) Granting Related Relief* ("DIP Motion") (Docket No. 48), both filed by the above-captioned debtor and debtor-in-possession ("Debtor").

The Waste Connections Parties respectfully request that this Court deny the Assumption Motion and DIP Motion in their entirety and grant such other relief as the Court deems just and proper. Alternatively, with respect to the DIP Motion, the Waste Connections Parties request the Court deny Debtor's request for interim DIP financing and an interim DIP superpriority claim or lien until a final hearing is held on the Debtor's DIP Motion. In support of this Omnibus Objection, the Waste Connections Parties respectfully state as follows:

**Preliminary Statement**

1. The relief the Debtor is seeking is inappropriate and designed to benefit the Debtor's parent. Its motions are not supported by evidence and should be met with skepticism and rejected, *especially* when there is no Committee in place to act as a watch dog, review the Debtor's budget, and vet or challenge the Debtor's unusual activity in this case. The Debtor is proposing a $1.5 million superpriority DIP loan from its insider parent company ("Insider Parent") in a case with only $4 million of scheduled unsecured claims and use that money to partially pay prepetition debt ahead of a plan. The Debtor is seeking in the first month of the case to benefit some creditors who are similarly situated over others—a result wholly inapposite of the intent of the Bankruptcy Code—with little notice and without any unconflicted factual support.

2. The Debtor did not submit a declaration in support of its DIP Motion and has not submitted *any* evidence explaining what efforts it undertook to seek out non-insider financing, why it needs the insider DIP loan it is requesting, or why it needs to borrow $500,000 on an emergency interim basis to prematurely pay cure costs owed to a small group of preferred vendor creditors ("Preferred Vendors") to the detriment of the Debtor's other unsecured creditors. The Debtor's *own budget* (which shows the Debtor paying $613,000 in prepetition expenses and contains a $410,000 mathematical error) shows the Debtor does not need the money. A corrected version of the Debtor's budget that accurately reflects the Debtor's projected cash position using the Debtor's own projections ("Corrected Budget") is attached hereto as **Exhibit A**. The Corrected Budget shows the Debtor does not need a DIP loan—certainly not on an emergency basis—and exposes this DIP Motion for what it is: an attempt to subordinate the Debtor's legitimate third-party creditors to the Insider Parent.

3. To put more context around the Debtor's motions, there are no secured lenders or priority creditors in this case. The only creditors are the 69 unsecured creditors listed in the Debtor's schedules who the Debtor claims are owed a combined total of $4 million.[1] The Debtor's schedules show that the majority of its unsecured creditors (40 creditors - 58%)[2] are owed less than $5,000 each with most being owed less than $1,000 each, so the Debtor paid them current or close to current as of the Petition Date. Of the creditors that remain, the Debtor is asking to immediately pay a handful of preferred vendors ("Preferred Vendors") (8 creditors - 11%) a total of $500,000 so those Preferred Vendors are paid in full at the outset of the case. The remaining creditors (20 creditors – 28%)[3] are mostly non-vendor creditors that account for $3.5 million of the $4 million in unsecured debt listed in the Debtor's schedules. After the Debtor pays this handful of Preferred Vendors that are not already current, these remaining creditors (and the Waste Connections Parties) are unlikely to receive anything at all in this case. This is a near certainty if the Debtor's Insider Parent is allowed to make a DIP loan that saddles the Debtor's *currently unencumbered* assets with a superpriority claim and lien, to a Debtor that will only use the funds to pay the Preferred Vendors and Debtor's bankruptcy counsel.

4. The Waste Connections Parties also have substantial claims against the Insider Parent for operating the Debtor's business in an illegal and fraudulent manner. This same Insider Parent is now attempting to use the Bankruptcy Code to protect itself from the consequences of its malfeasance, and in the process is causing harm to the Debtor's creditors.

---

[1] The Debtor disingenuously lists "Waste Connections" as having a claim in the amount of $1,042.08. In fact, in the El Paso Litigation (defined below), the Waste Connections Parties have claims against the Debtor for more than $15 million, plus treble damages and fees.
[2] This number does not include the Waste Connections Parties or their claim.
[3] This number does not include the Waste Connections Parties or their claim.

5. This is a transparent attempt by the Debtor to (i) circumvent the entire Plan process and enact what is effectively a *sub rosa* plan that prefers certain of the Debtor's creditors over others and (ii) give the Debtor's Insider Parent a superpriority administrative claim and all assets lien to fund these *sub rosa* expenses and the administrative costs of a bankruptcy case that was filed as a litigation tactic and is being prosecuted for the sole benefit of the Insider Parent. No Committee has been formed to vet the Debtor's projections and financials or challenge the Debtor's scheme, but even without a Committee it is clear the Debtor is acting in contravention of the Bankruptcy Code.

6. The Debtor claims paying its Preferred Vendors now is critical because those vendors are "small businesses" that need the money and might refuse to provide services if they are not paid. A simple Google search reveals these are <u>not</u> small businesses; they are mostly portfolio companies owned by multi-billion-dollar private equity funds or large scale independently owned businesses that operate multiple facilities across multiple states. They are large and sophisticated and are no doubt aware they are legally obligated to continue providing services to the Debtor under the terms of their executory contracts for the duration of this case. The Debtor also fails to explain why it could not simply hire other waste collection companies if the Preferred Vendors refuse to provide services in violation of the Bankruptcy Code. This is not an appropriate basis to assume a contract at commencement of the case prior to any determination over the direction and success of this case.

7. The Debtor claims it needs DIP financing to "maintain" its business operations, but the Debtor did not provide a declaration and does not articulate any specific need or emergency. On the contrary, *the Debtor's own budget attached to the DIP Motion* shows there is no need for emergency financing. The Debtor does not claim it is at risk of missing payroll for its six

employees and does not claim to be unable to pay its operating expenses. As long as the Debtor does not spend $500,000 to improperly pay the Preferred Vendors' prepetition claims—which is the Debtor's only stated reason for seeking interim financing—the Debtor's budget shows it has plenty of unencumbered funds available to finance its operations.

8. In almost every pleading filed in this case, the Debtor has admitted that it filed this bankruptcy case <u>not</u> to reorganize, but to avoid litigation with the Waste Connections Parties ("<u>El Paso Litigation</u>"). The Debtor's schedules and statement of financial affairs demonstrate that, until now, the Debtor's Insider Parent has been funding the Debtor's litigation expenses and any operating shortfalls with equity contributions. There were $9 million in insider transfers in the one year before the Petition Date. Now, the Debtor's Insider Parent—who stands to benefit the most from this bankruptcy case—says it will only fund the Debtor if its insider loans are positioned ahead of the Debtor's non-insider creditors. If the Debtor cannot afford to pay its operating expenses or the administrative expenses of this case, this case is administratively insolvent and should be dismissed or converted.

9. If the Debtor's Insider Parent wants to continue funding the Debtor as it has done in the past and paying the administrative expenses of this case because it sees a benefit then it can do so—but it needs to fund the Debtor on a subordinated or unsecured basis that ensures the claims of the Debtor's legitimate third-party creditors are paid first. In addition, it is evident that the Debtor (or a subsequent Committee or creditor) will have a difficult time commencing any avoidance or other claims against the Debtor—or the Debtor's executives or proposed bankruptcy counsel who received approximately $2 million during the preference period—if the Insider Parent is granted first liens and control over the future of this chapter 11 case.

10. The relief the Debtor is seeking in the Assumption Motion and DIP Motion is directly contradictory to both the letter and the purpose of the Bankruptcy Code. For these reasons and the reasons articulated below, the Court should deny the Debtor's Assumption Motion and should deny the Debtor's DIP Motion in its entirety, including denying Debtor's request for harmful and unnecessary interim DIP financing. If the Court is inclined to consider the Debtor's DIP Motion at all, the Waste Connections Parties request the Court deny the Debtor's request for interim financing and hold the Debtor's request in abeyance pending a final hearing.

## **Objection to Debtor's Assumption Motion**

11. As the Debtor recognized in its Assumption Motion, the case law makes clear that a Debtor only satisfies the business judgment test for assuming an executory contract if the Debtor can show that "[assumption] will be advantageous to the estate" or "appears to enhance a debtor's estate." (Assumption Motion at 5-6 n. 1-4.) The Debtor claims that assuming the Preferred Vendors' executory contracts and paying $500,000 to "cure" the prepetition claims owed to those Preferred Vendors is critical to the Debtor's operations because the Preferred Vendors are "small businesses" who rely on payments from the Debtor and that assuming these select contracts will enhance and benefit the estate. On the contrary, these vendors are not "small businesses," and taking the unusual step of assuming these executory contracts so early in the case will subordinate the claims of the Debtor's remaining unpaid unsecured creditors to a superpriority claim in favor of the Debtor's Insider Parent.

12. It is also axiomatic that the Debtor should not be permitted to assume contracts at the beginning of the chapter 11 case until it is clear that the case will be successful. *See, e.g., Costich v. Nostas Assoc. (In re Kleinsleep Products, Inc.),* 78 F.3d 18, 26 (2d Cir. 1996) (denying debtor's request to reject leases that had been assumed early in the bankruptcy case and holding

6

all claims for breach of the lease were administrative claims). To the extent the Debtor's case is not a success or the Debtor otherwise needs to reject any of these contracts, the administrative claims will ensure the Debtor's other creditors receive nothing. There is a need for careful consideration when taking such drastic and permanent action. It is clear there is no supporting analysis or consideration of the gravity of these decisions.

> A. *The Preferred Vendors the Debtor Intends to Pay Are Not Small Businesses and Are Required to Continue Providing Services to the Debtor Under Their Existing Hauler Agreements Pursuant to Section 365 of the Bankruptcy Code*

13. Throughout the Assumption Motion, the Debtor repeatedly claims that the Preferred Vendors are "small businesses" which rely on the Debtor's payments to fund their operations and that these "small businesses" might refuse to continue providing services if they are not paid. (Assumption Motion ¶¶ 11, 13, 17, 18, 24-25.) A simple Google search proves the Debtor is incorrect and that its hypothetical concerns about refusal to perform are unfounded.

14. Vendor Texas Pride Disposal is a portfolio company of NMS Capital, a private equity investment firm which, according to its website, has $1.5 billion under management.[4] Vendor Coastal Waste and Recycling is majority owned by Macquarie Asset Management, a private equity firm which, according to its website, has $237.7 billion under management. According to Coastal Waste and Recycling's website, the company employs over 1,110 people and operates 25 facilities.[5] Vendor GFL Holdco (US) is owned by GFL, a publicly traded company that, according to its website, earned over $7 billion in revenue in 2023.[6] Even vendor Universal Waste Systems, a company that appears to be family owned, touts on its website that it operates in

---

[4] *See* https://nms-capital.com/news/nms-capital-portfolio-company-texas-pride-disposal-solutions-announces-acquisition-of-basin-disposal/ (last visited November 13, 2025).
[5] *See* https://www.macquarie.com/us/en/about/news/2023/macquarie-asset-management-completes-investment-in-coastal-waste-and-recycling.html (last visited November 13, 2025).
[6] *See* https://investors.gflenv.com/English/news/news-details/2025/GFL-Environmental-Reports-Third-Quarter-2025-Results-and-Raises-Full-Year-2025-Guidance/default.aspx (last visited November 13, 2025).

7

California, Arizona and New Mexico and is "one of the largest family owned and operated companies in the West."[7] The Preferred Vendors are not small businesses who rely on the Debtor to pay the bills. They are mostly large companies owned by multi-billion-dollar private equity funds, and the Debtor's arguments to the contrary must be rejected.

15. Further, nowhere in the Assumption Motion does the Debtor allege that any of the Preferred Vendors has refused to provide services or threatened not to provide services. The Debtor says only that there is a "risk" that the Preferred Vendors "may" stop providing services because they are "small businesses for the most part unfamiliar with the bankruptcy process." (Assumption Motion at 24-25.) The Debtor's baseline assumption is invalid because the Preferred Vendors are primarily large, sophisticated businesses. This case has also been pending for more than a month. If one of the Preferred Vendors was going to refuse to provide services because the Debtor was in bankruptcy, it would have done so by now. The Debtor also fails to explain why it could not hire other waste collection companies if the Preferred Vendors refuse to provide services in violation of the Bankruptcy Code. The Debtor is manufacturing a hypothetical emergency that does not exist.

      **B.**    ***The Debtor Will Not Be Harmed If It Does Not Assume the Preferred Vendors' Hauler Agreements, But Assuming the Preferred Vendors' Hauler Agreements Will Significantly and Negatively Impair the Debtor's Estate***

16. In the Assumption Motion, the Debtor makes vague, unsubstantiated arguments that the Debtor's business will be "irreparably harmed" if the Preferred Vendors stop performing their contracts because "a large amount of the Debtor's customers would terminate their customer agreements with the Debtor" if there was a disruption in service from the Preferred Vendors. (Assumption Motion ¶¶ 16-17.)

---

[7] *See* https://www.uwscompany.com/about-us/ (last visited November 11, 2025).

17. The Debtor has not provided a declaration or any other evidence to support this claim. The Debtor does not state what percentage of customers are served by the Preferred Vendors. The Debtor's claims are also belied by the Debtor's own prepetition actions. In the Assumption Motion and the Debtor's schedules, the Debtor claims to have executory contracts with more than 50 vendors. (Assumption Motion ¶ 14; Schedules at 32-34.) As noted above, most of those vendors were paid current or close to current as of the Petition Date (*See* Schedules at 12-29.) If these Preferred Vendors were so critical and so likely to stop providing services, the Debtor would have been paying them current, as it did with its other vendors.

18. In fact, the Debtor will not be harmed at all if it does not assume the Preferred Vendor contracts. The Debtor admits that each of the Preferred Vendors entered into "Hauler Agreements" with the Debtor, that those vendors "would not be permitted to stop providing service on account of pre-petition debt owed as a counterparty to an executory contract" and that the Debtor would "have the legal right to seek to compel continued performance." (Assumption Motion ¶¶ 13, 17, 25.) The same goes for the Debtor's customers—even if there was a slight disruption in service (again, unlikely), the Debtor's customers could not terminate their contracts with the Debtor without seeking relief from the automatic stay. These are issues common to all bankruptcy cases. There is no emergency or operational threat that makes this case unique or requires the Debtor to assume these vendor contracts now.

19. On the contrary, it is without question that the Debtor's other unsecured creditors will be significantly harmed if the Debtor assumes the Preferred Vendors' Hauler Agreements. Such an action would convert $500,000 of prepetition unsecured debt into administrative expenses, along with all other expenses that may exist under the undisclosed terms of these Hauler Agreements. The Debtor has not provided any information about the most basic terms of these

9

Hauler Agreements—term, amounts owed—so creditors have no way to know the full extent of how much is being assumed. On top of this, the Debtor says it must take on DIP loan that will grant the Debtor's Insider Parent a superpriority claim and a lien against the Debtor's assets that are currently unencumbered and available to other creditors.

20. The Debtor's requested relief is clearly detrimental to the estate and its creditors and the Assumption Motion should be denied.

## **Objection to DIP Motion**

21. As noted by the Debtor in the DIP Motion, DIP financing should only be approved "so long as the request for financing does not contain terms that leverage the bankruptcy process and power or its purposes is not so much to benefit the estate as it is to benefit a party-in-interest." *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990). The business judgment rule "is not applicable to transactions among a debtor and an insider of the debtor. Those kinds of transactions are inherently suspect because they are rife with the possibility of abuse." *In re LATAM Airlines Grp. S.A.*, 620 B.R. 722, 769 (Bankr. S.D.N.Y. 2020) (quotations and citations omitted). Instead, courts apply a "heightened scrutiny" test in assessing the bona fides of a transaction among a debtor and an insider of the debtor. *Id.* (citing *In re MSR Hotels & Resorts, Inc.*, No. 13-11512, 2013 Bankr. LEXIS 4422, at *1 (Bankr. S.D.N.Y. Oct. 1, 2013) (courts "have generally applied a heightened standard of scrutiny when the transaction [in] question is with an insider of the debtor.")); *see also Pepper v. Litton*, 308 U.S. 295, 306, (1939) (noting that a controlling shareholder's "dealings with the corporation are subjected to rigorous scrutiny and where any of their contracts or engagements with the corporation is challenged the burden is on the director or stockholder to not only prove the good faith of the transaction but also to show its inherent fairness...").

22. "In applying heightened scrutiny, courts are concerned with the integrity and entire fairness of the transaction at issue, typically examining whether the process and price of a proposed transaction not only appear fair but are fair and whether fiduciary duties were properly taken into consideration." *In re Innkeepers USA Tr.*, 442 B.R. 227, 231 (Bankr. S.D.N.Y. 2010). Thus, an insider's dealings with the debtor are subject to rigorous scrutiny by the court, with the insider bearing the burden of showing the "entire fairness" of the transaction at issue. *LATAM Airlines*, 620 B.R. at 769; *see also In re L.A. Dodgers LLC*, 457 B.R. 308 (Bankr. D. Del. 2011) (denying DIP motion where the proposed DIP lender was an insider and the debtor failed to satisfy the "entire fairness" test).

23. The only case the Debtor cites to support its argument that its insider DIP loan is justifiable is easily distinguishable. In *In re Utah 7000, L.L.C.*, No. 08-21869, 2008 Bankr. LEXIS 4276 (Bankr. D. Utah July 3, 2008), the debtor provided evidence that it actively sought financing from non-insiders, there was a committee in place in that case that was involved in the DIP negotiations, and there was evidence that the lender made concessions. None of those facts are present here, and the DIP Motion should be denied.

    **A.**    ***The Debtor Has Not Submitted Any Evidence Demonstrating What Efforts Were Taken to Seek a Non-Insider DIP Loan***

24. In the DIP Motion, the Debtor states "there is no replacement financing available to the Debtor." (DIP Motion ¶ 3.) The Debtor did not submit a declaration with the DIP Motion. The Debtor has not provided any evidence about how many potential non-insider lenders the Debtor contacted, whether any non-insider lenders offered to provide financing, or what terms were discussed by any non-insider lenders. These types of disclosures are standard for a typical DIP loan. Transparency is even more important when dealing with an insider DIP loan.

11

### B. *The Debtor Has Not Submitted Any Evidence Demonstrating the DIP Loan Is Critical Or Necessary. On the Contrary, the Debtor's Budget Submitted With the DIP Shows the DIP Loan is <u>Not</u> Critical or Necessary*

25. The Debtor argues, without support, that the DIP loan is "vital to maintaining the Debtor's ongoing operations." (DIP Motion ¶ 2.) The Debtor's DIP budget ("<u>Budget</u>") and its own prepetition actions contradict its argument that the DIP financing is critical. If the DIP financing was truly critical for the Debtor's emergency survival, the Debtor would have filed the DIP motion on the first day. It did not. This case has been operating for a month without a DIP loan, undercutting the Debtor's argument that DIP financing is critical.

26. According to the Budget and the DIP Motion, nearly all of the Debtor's proposed $1.5 million DIP loan will be used to pay the Debtor's bankruptcy counsel and select prepetition claims. The Debtor's Budget contemplates $613,171 to pay "Past-due Haulla COGS" (at least $500,000 of which is no doubt "cure" payments to the Preferred Vendors) and $450,000 to pay the Debtor's bankruptcy expenses. None of these expenses benefit the Debtor's estate or its creditors. This exclusively benefits the Insider Parent, who had previously been funding the Debtor with equity infusions, and is using this bankruptcy case as a litigation tactic against the Waste Connections Parties. The insider DIP loan does not benefit the estate, which is currently unencumbered, or its creditors, who will be subordinated to the Debtor's Insider Parent.

### Conclusion

For the reasons stated above, the Waste Connections Parties respectfully request that this Court deny the Assumption Motion and DIP Motion in their entirety and grant such other relief as the Court deems just and proper. In addition, with respect to the DIP Motion, the Waste Connections Parties request that the Court deny Debtor's request for interim DIP financing and an interim DIP superpriority claim or lien until a final hearing is held on the Debtor's DIP Motion, and grant such other relief as the Court deems just and proper.

| | |
|---|---|
| Dated: November 14, 2025 | Respectfully submitted,<br><br>**BAKER & HOSTETLER LLP**<br><br>By: */s/ Alexis C. Beachdell*<br>Joshua J. Bennett<br>Texas Bar No. 24059444<br>jjbennett@bakerlaw.com<br>2850 North Harwood Street, Suite 100<br>Dallas, Texas 75201<br>Tel: 214.210.1200<br>Fax. 214.210.1201<br><br>Daniel J. Buzzetta (admitted *pro hac vice*)<br>New York Bar No. 2680528<br>dbuzzetta@bakerlaw.com<br>Jorian L. Rose (*pro hac vice forthcoming*)<br>New York Bar No. 2901783<br>jrose@bakerlaw.com<br>45 Rockefeller Plaza, 14th Floor<br>New York, New York 10111<br>Tel: 212.589.4200<br><br>Alexis C. Beachdell (admitted *pro hac vice*)<br>Ohio Bar No. 0083642<br>abeachdell@bakerlaw.com<br>Scott E. Prince (admitted *pro hac vice*)<br>Ohio Bar No. 0096004<br>sprince@bakerlaw.com<br>127 Public Square, Suite 2000<br>Cleveland, Ohio 44114<br>Tel: 216.621.0200<br><br>*Attorneys for El Paso Disposal, LP;*<br>*Waste Connections of Texas, LLC;*<br>*Waste Connections Lone Star, Inc.;*<br>*and Waste Connections US, Inc.* |

## CERTIFICATE OF SERVICE

      I hereby certify that, on November 14, 2025, a true and accurate copy of the foregoing omnibus objection was served electronically via the Court's CM/ECF notification system on all parties registered to receive such service.

      */s/ Alexis C. Beachdell*
      Alexis C. Beachdell (*admitted pro hac vice*)
      *Counsel for El Paso Disposal, LP; Waste Connections of Texas, LLC; Waste Connections Lone Star, Inc.; and Waste Connections US, Inc.*