Emily S. Chou
State Bar No. 24006997
J. Blake Glatstein
State Bar No. 24123295
Mary Taylor Stanberry
State Bar No. 24143781
**VARTABEDIAN HESTER & HAYNES LLP**
301 Commerce Street, Suite 2200
Fort Worth, Texas 76102
Tel: 817-214-4990
emily.chou@vhh.law
blake.glatstein@vhh.law
mary.stanberry@vhh.law

PROPOSED ATTORNEYS FOR DEBTOR
AND DEBTOR-IN-POSSESSION

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 Case |
| | ) | |
| ECUBE LABS CO. | ) | Case No. 25-43950 |
| | ) | |
| | ) | |
| Debtor. | ) | |

## DECLARATION OF JAMES NOH IN SUPPORT OF THE NOVEMBER 14, 2025 HEARING

James Noh makes the following Declaration in Support of Debtor Ecube Labs Co.'s ("Debtor's") Omnibus Motion for Entry of an Order (i) Authorizing the Assumption of Eight Hauler Agreements, and (ii) Establish the Cure Amounts Associated with the Eight Hauler Agreements ("Omnibus Motion," ECF No. 47) and Motion for Entry of Interim and Final Orders (i) Authorizing the Debtor to Obtain Secured Post-Petition Financing, (ii) Scheduling a Final Hearing, and (iii) Granting Related Relief ("DIP Motion," ECF No. 48, and collectively, "Motions"):

1

1.      "My name is James Noh. I am over the age of twenty-one (21) years and of sound

mind. I am an officer of Debtor and manage the finances and operations of Debtor.  In my position,

I am familiar with Debtor's operations, finances, and vendor contracts.  Therefore, I have personal

knowledge of the facts set forth below and know them to be true and correct as stated.

2.      The Debtor is a Delaware corporation.  The Debtor brokers waste management

services for the commercial sector.  It connects local businesses with local waste haulers.

3.      Unlike traditional waste management companies, the Debtor does not have its own fleet of

dump trucks, a pool of drivers as employees, or boots-on-the-ground salespeople across the country.  The

Debtor maintains a small staff of office employees for administrative and back-office tasks, the Debtor

contracts with third-party staffing agencies to staff the company's remote sales and customer service teams,

and the Debtor contractually engages independent and primarily small-business waste haulers local to the

Debtor's customers to provide waste pickup services.  As of the Petition Date, the Debtor has grown its

business to thousands of customers.

4.      As described above, the Debtor engages third-party haulers ("Independent

Haulers") to provide waste pickup for its customers.

5.      To generate revenue, the Debtor's business critically relies on good working

relationships with Independent Haulers. Over the last few months, the Debtor has worked tirelessly

to keep the relationships as cash became tight before filing bankruptcy.

6.      With a few exceptions, the Independent Haulers consist of small businesses with

limited resources.  Each of the Independent Haulers entered a "Hauler Agreement" with the Debtor

to govern the terms of the parties' relationship.  There are a few different forms of the Hauler

Agreement, but the terms are substantially similar among the forms.

7.      As of the Petition Date, the Debtor is actively engaged with almost 50 Independent Haulers, and nearly all the Independent Haulers are owed payment by the Debtor for services provided prepetition.

8.      The Independent Haulers are the lifeblood of the Debtor's business.  One of the primary reasons the Debtor can offer services to its customers at a lower price than the larger traditional waste management companies is through the use of the Independent Haulers to service customers local to the haulers.  Under this business model, overhead is reduced for both the Debtor and the Independent Haulers, and the customers enjoy the benefits of a lower price as compared to the larger traditional waste management companies.

9.      A few of the Independent Haulers are irreplaceable for the Debtor's business because no other local hauler can service some of the Debtor's customers' specific locations and for the prices the Debtor is paying.  The Debtor has worked tirelessly over the years to negotiate the lowest prices with local haulers to save its customers more money and maximize its margins.

10.     With this subset of Independent Haulers, the Debtor's business would be irreparably harmed if they stopped performing on their executory contracts.  While the Debtor could seek to compel performance, a significant amount of the Debtor's customers would terminate their customer agreements with the Debtor for competitors' waste services if the Debtor missed even one week's waste pickup services.  The Debtor's customers rely on the Debtor's consistency of service through its Independent Haulers.

11.     Furthermore, the Debtor wants to avoid having to potentially compel performance of executory contracts from its Independent Haulers because (a) the costs to compel contracts it intends to assume during the pendency of the bankruptcy would only waste the Debtor's resources

3

unnecessarily, and (b) the Debtor wants to minimize the disturbance to its working relationship with these Independent Haulers.

12.     Debtor's Omnibus Motion seeks to assume the following Hauler Agreements:

| Agreement | Counterparty to Agreement | Proposed Cure |
|---|---|---|
| Feb. 8, 2024 Hauler Agreement | Carolina Waste Group | $88,827.64 |
| Mar. 18, 2022 Hauler Agreement | Coastal Waste & Recycling Inc. | $76,869.20 |
| June 4, 2024 Hauler Agreement | Fusion Recycling LLC | $33,175.77 |
| Nov. 1, 2024 Hauler Agreement | GFL Holdco (US), LLC | $23,337.78 |
| Oct. 26, 2022 Hauler Agreement | Recycling Services of Florida, Inc. (a/k/a Midwest Paper Retriever) | $6,167.86 |
| Aug. 8, 2023 Hauler Agreement | Rio Grande Waste Services, Inc. | $55,165.14 |
| Apr. 22, 2020 Hauler Agreement | Texas Pride Disposal | $158,085.50 |
| June 21, 2022 Hauler Agreement | Universal Waste Systems Inc. | $114,986.84 |

13.     A true and correct copy of the above compilation of the Hauler Agreements is attached as Exhibit 1 to Debtor's Omnibus Motion.

14.     Additionally, a true and accurate copy of each of the Hauler Agreements identified above are attached as Exhibits 10 through 17, respectively, to ECF No. 59.

15.     The assumption of the Assumed Hauler Agreements is important to the stability of the Debtor's business and for a successful reorganization.  These eight Independent Haulers (collectively, the "Eight Haulers") represent haulers that service areas in which the Debtor cannot easily, or there are no other viable options, to replace.  Therefore, the Debtor believes the preservation of a good relationship with these Eight Haulers is integral to the stability of the Debtor's operations and its very restructuring viability.

16.     The Eight Haulers have been intermittently suspending waste pickups for the Debtor's customers to recoup minor amounts to continue service.  Once the Debtor filed for

4

bankruptcy protection, it no longer could pay pre-petition debts in small amounts to keep service at customers from being suspended.  Therefore, the Debtor has continuously worked with the Eight Haulers to overcome threats of suspension.  Notwithstanding the bankruptcy filing, the Eight Haulers have threatened that they will terminate services if they are not paid their pre-petition debts.  If this occurs, the Debtor will lose the customers and the Debtor's reputation in the marketplace for being able to timely deliver waste management services will be irreparably tarnished.

17.     While I understand that we could threaten legal action to compel the Eight Haulers' performance on these contracts, this, too, would cause the Debtor irreparable harm.  We can only grow revenues by growing our relationships with Independent Haulers.  If we threaten them to compel or actually compel them to perform, the Debtor's relationship will be soured with these Eight Haulers that cannot be replaced.  The Eight Haulers will likely choose to not take on new customers during the pendency of the bankruptcy and will likely terminate their contracts with us as soon as the bankruptcy is over, making a reorganization far more difficult and potentially impossible.  Additionally, while the Debtor is using its limited financial resources to compel the Eight Haulers' service, the Debtor will lose the customers that the Eight Haulers service because the customers will have garbage piling up.

18.     The Debtor and all of its creditors are far better off with a company that maintains and grows its revenue streams during bankruptcy rather than alienating its revenue sources that cannot be replaced. Moreover, if the Debtor does not maintain and grow its revenues during bankruptcy, the natural churn of customers will cause the Debtor to lose revenue without replacement. This is why the Debtor moves the Court to allow the Debtor to assume these contracts.

19.     The Debtor reached out to each of the Eight Haulers to confirm the cure cost for each of the Hauler Agreements to be assumed.  All but one confirmed the cure cost.

20.     A true and accurate copy of the confirmations from seven of the Eight Haulers are attached as Exhibits 2 and 4 through 9 to ECF No. 59.  Exhibit 3 attached to ECF No. 59 is a true and accurate copy of the last email and invoice received from the hauler Carolina Waste Group, identifying the amount the Debtor understands would be the cure cost for its respective Hauler Agreement. Accordingly, the Debtor submits that the cure costs, as stated in Exhibit 1, represent the correct amount needed to cure, and the payment of such cure amounts will facilitate the assumption of the Hauler Agreements with the Eight Haulers.

21.     Because the Eight Haulers are an indispensable part of the Debtor's operations as they service particular areas that the Debtor has little other options to find replacement haulers at or near the costs of these negotiated Assumed Hauler Agreements, the Debtor seeks the assumption of the Assumed Hauler Agreements of the Eight Haulers at this early juncture in the case because it cannot afford to risk these haulers refusing to work with the Debtor.

22.     These Eight Haulers present a real risk they would simply stop providing services to the Debtor and its customers.  As previously explained, the Debtor may have the legal right to seek to compel continued performance, but the gap in services to the Debtor's customers would result in the Debtor losing significant customers altogether and create irreparable reputational harm to the Debtor.

23.     Rather than risking the loss of customers and tarnish the Debtor's reputation of being able to service its customers, in the exercise of its good-faith business judgment, the Debtor believes the assumption of the Assumed Hauler Agreements are in the best interests of the Debtor's operations and viability and thus in the best interest of the estate and creditors.

24.     The assumption of the Assumed Hauler Agreements will not create substantial burden to the estate.  The agreements provide for the Debtor's ability to terminate without penalty as to several of the eight Assumed Hauler Agreements, or limited termination damages of a maximum of three months of service charges.

25.     The Debtor seeks to expedite the Omnibus Motion as the Debtor is concurrently seeking authorization to obtain secured post-petition financing through its DIP Motion, which would provide the Debtor with the working capital needed to pay the cure costs for the Assumed Hauler Agreements, minimizing the disturbance to the Debtor's working relationship with the Eight Haulers that the Debtor critically relies on.

26.     By the DIP Motion, the Debtor seeks to enter into post-petition financing for a line of credit for the maximum aggregate principal amount of $1,500,000 (the "DIP Facility") pursuant to the terms and conditions set forth in the Debtor-In-Possession Term Loan Facility term sheet (the "DIP Term Sheet") with Ecube Labs Co., Ltd., the Debtor's proposed DIP lender (the "DIP Lender") and the Debtor's parent company that owns 100% of the outstanding shares of the Debtor's common stock.

27.     A true and accurate copy of the DIP Term Sheet is attached as Exhibit 18 to ECF No. 59.

28.     On behalf of the Debtor, I sought third-party financing from other sources. For example, I sought financing from a number of traditional banks, and they refused to make loans to the Debtor because, among other reasons, the Debtor is owned by a foreign person or entity. I also sought financing from factoring companies, and the factoring companies would not let the Debtor use the credit facilities after filing for bankruptcy, charge high interest rates, and offered credit facilities significantly less than the Debtor's needs. And I sought financing from a loan broker, but

each lender I spoke with rejected loaning to the Debtor for various reasons.

29.     Therefore, the proposed DIP Facility represents significantly better-than-market terms to the Debtor, including a favorable interest rate, no fees, and no scheduled interest or principal payments until the effective date of a Plan, sale of substantial all of the assets of the Debtor, and other conditions as set forth in the DIP Term Sheet and definitive loan documents to be executed.

30.     The DIP Facility is vital to maintaining the Debtor's ongoing operations. In light of the Debtor's current economic circumstances, there is no replacement financing available to the Debtor, and no replacement financing available under better terms.

31.     Subject to approval of the Court, the Debtor has executed the DIP Term Sheet which is a binding commitment from the DIP Lender to provide the post-petition financing pursuant to the terms and conditions set forth in the DIP Term Sheet, which shall be incorporated into a more formal instrument and hereafter be referred to as the DIP Facility into which the Debtor shall enter upon the Court's entry of the proposed interim order.

32.     The Debtor was sued by competitor entities El Paso Disposal, LP, Waste Connections of Texas, LLC, and Waste Connections Lone Star, Inc. and later Waste Connections US, Inc. (the "WC Action"). The Plaintiffs (collectively, "Waste Connections") are related entities to one of the largest waste management companies in the world.

33.     As of the Petition Date, discovery was ongoing in the WC Action. The defense cost has taken a heavy toll on the Debtor's economic condition. The Debtor's financial health has deteriorated to such an extent that the Debtor struggles to meet its business operational needs on a daily basis. Consequently, the Debtor is in need for post-petition financing to provide critical working capital to stabilize the Debtor's operations for a chance at reorganization.

34.     An immediate and critical need exists for the Debtor to obtain funds in order to continue the operations of its business.  At this time, the ability of the Debtor to finance its operations through the incurrence of new indebtedness is vital to the preservation and maintenance of its going-concern value.  The use of the DIP Facility is vital, necessary, and critical to the Debtor's ongoing operations.  The Debtor's ability to preserve its relationship with employees, salesforce, contract haulers, vendors and suppliers, and customers, and to otherwise finance its operations, is essential to the Debtor's continued viability.

35.     Absent the relief requested by the DIP Motion, the Debtor faces a material and certain risk of substantial, irreparable harm.  On the other hand, access to the DIP Facility will ensure the Debtor has sufficient funds to preserve and maximize the value of its estate, and to responsibly administer this Bankruptcy Case.

36.     The Debtor believes that it is in the best interests of its business, creditors, and other parties-in-interest to enter into the proposed DIP Facility to maintain its operations and preserve its business value.

37.     The proceeds of the DIP Facility will be used (a) for working capital and general corporate purposes of the Debtor; (b) to pay fees and expenses related to the DIP Facility and the administration of this Case; and (c) to pay fees mandated by the Bankruptcy Code and estate professionals (subject to Court approval).  Attached as Exhibit 19 to ECF No. 59 is a 13-Week Budget to show the Debtor's intended use of the borrowed funds.

38.     Under the particular circumstances of this Case, these are the only terms under which the DIP Lender will provide the financing.  The DIP Facility proceeds are necessary and the Debtor could not find financing with better terms at this time.

39.     With the advice of Debtor's counsel, I negotiated the DIP Facility and the DIP

Terms Sheet with Sunbeom "Sean" Gwon, the CEO of the DIP Lender and the Debtor's parent company. Mr. Gwon was represented by separate counsel—both in the United States and in South Korea, where Debtor's parent offices and is incorporated. To my knowledge, no other parties participated in the negotiations of the DIP Facility and Terms Sheet.

40.     The Debtor believes the DIP Facility is the result of the Debtor's reasonable and informed determination that the DIP Lender offered the terms of the DIP Facility in good faith as the terms represent at least as good as, or better, economic terms than those that may be provided by a third-party lender. Thus, I believe the terms and conditions of the DIP Facility are fair and reasonable, and the proceeds under the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code. And, as explained above, the Debtor and its estate will suffer immediate and irreparable harm if the interim relief requested is not granted."

41.     Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury that the foregoing is true and correct."

EXECUTED October 14, 2025.

_____
James Noh