Emily S. Chou
State Bar No. 24006997
J. Blake Glatstein
State Bar No. 24123295
Mary Taylor Stanberry
State Bar No. 24143781
**VARTABEDIAN HESTER & HAYNES LLP**
301 Commerce Street, Suite 2200
Fort Worth, Texas 76102
Tel: 817-214-4990
emily.chou@vhh.law
blake.glatstein@vhh.law
mary.stanberry@vhh.law

PROPOSED ATTORNEYS FOR DEBTOR
AND DEBTOR-IN-POSSESSION

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### FORT WORTH DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 Case |
| | ) | |
| ECUBE LABS CO. | ) | Case No. 25-43950 |
| | ) | |
| | ) | |
| Debtor. | ) | |

### DECLARATION OF JAMES NOH IN SUPPORT OF
### DEBTOR'S CASH MANAGEMENT MOTION FOR ENTRY OF
### AN ORDER (1) AUTHORIZING THE DEBTOR TO MAINTAIN
### ITS EXISTING REIMBURSEMENT SYSTEM IN THE ORDINARY
### COURSE OF ITS BUSINESS; AND (2) FOR RELATED RELIEF

James Noh makes the following Declaration in Support of Debtor Ecube Labs Co.'s ("Debtor's") *Debtor's Cash Management Motion for Entry of an Order (1) Authorizing the Debtor to Maintain Its Existing Reimbursement System in the Ordinary Course of Business; and (2) for Related Relief* ("Motion"):

1. "My name is James Noh. I am over the age of twenty-one (21) years and of sound mind. I am the chief financial and operations officer of the Debtor. In my position, I am familiar

with Debtor's operations and finances. Therefore, I have personal knowledge of the facts set forth below and know them to be true and correct as stated.

2. The Debtor created a system years ago for its accounts payables ("AP") to be paid by use of its officers' personal credit cards processed through a bill-pay system called Melio. While fellow officers Jae Han and Hyoung In Oh make some payments, the vast majority—over 80%—of the payments are made by me, using my credit cards. Melio makes payments, by credit card, to vendors, matches its payments to invoices, and tracks reimbursements (the "Reimbursement System"). The Reimbursement System using Melio creates the Debtor's books and records and allows the Debtor to pay its vendors through an easy and instant mechanism, often required by its vendors.

3. As the Debtor's Chief Operating and Financial Officer, I developed the Reimbursement System. I joined the Debtor in 2019 when the Debtor was strictly an exclusive distributor for its parent company Ecube Labs Co., Ltd.'s ("Ecube Korea's") patented waste management technology products. From 2016 to 2018, before I joined the Debtor, the company struggled as a startup, and its credit was damaged by late payments to vendors and other cashflow mismanagement. The original CFO that I later replaced set up all the company accounts at Wells Fargo, where the Debtor currently holds bank accounts.

4. When I joined the Debtor, the company was much smaller and had low bank balances. A combination of low monthly bank balances and bad business credit meant that sending payments by wire was expensive for the Debtor. Plus, at the time in the distribution business especially, the Debtor did a lot of international purchases with vendors and international wires were even more expensive.

2

5. As I started building the Debtor's waste management brokerage business and looked for ways to expand the distribution business, the Debtor's AP increased correspondingly. But the Debtor's debit card at the time had a daily transaction limit of $3,000, so the Debtor badly needed an inexpensive payment mechanism to pay its increased expenses. The Debtor tried to sign up for a business credit card through Wells Fargo, but it was rejected because I was not a "US person" at the time since I was working in the United States on a work visa and the Debtor was owned by a non-US entity. This led to me and other officers of the Debtor to use personal credit cards to pay the AP and then getting reimbursements from the Debtor.

6. In 2020 and 2021, the Debtor started to grow as it expanded into the waste management brokerage business. This meant increased AP. Many of the Debtor's third-party haulers and technology vendors require online payments. While the Debtor has the option of using ACH payments with some vendors, ACH often took two to five days to process compared to credit cards which is processed immediately. The Debtor continued to try to find ways to get a business credit card, even trying to sign up for products such as business lines of credit with a card attached. However, the fact that the Debtor is owned by a non-U.S. entity continued to be an obstacle to the Debtor getting approved for a credit card.

7. In 2022 and 2023, the Debtor experienced significant growth in the waste management brokerage business, and the record keeping of charging on personal credit cards and reimbursements was becoming cumbersome, but the Debtor was still unable to obtain a business credit card. Plus, by that time, my and other officers' personal credit limits had grown much higher due to constant usage, so the increased personal credit lines kept pace with the Debtor's daily needs.

8. After some research to help with the growing stack of paperwork to keep accurate records of the Reimbursement System, the Debtor found Melio, a payment system that allows the Debtor to input all its vendors and make payments in one place. This simplified things so the Debtor no longer had to manually track payment records across multiple vendors all with differing payment and receipt methods. Melio charges a small processing fee for the record-tracking and keeping. In my business judgment this system allowed the Debtor to stay lean and continue operations without adding bookkeeping employees. In my business judgment, I believed the Debtor was best served keeping its costs down while growing the business.

9. In 2024 and the beginning of 2025, the Debtor's credit had finally rebounded to satisfactory levels, and thus, the Debtor started getting offers from business credit card issuers. But, as before, once the Debtor got halfway through the application process, the application would get flagged by underwriting due to the Debtor's foreign ownership. The reply would be the same each time, requiring that I or other officers personally cosign or guarantee any business credit card. Plus, the credit lines offered on the personally guaranteed business cards were $20,000 or $30,000, which were insufficient to meet the Debtor's AP needs. My personal credit lines, and those of other officers, had become much larger and could sufficiently cover the Debtor's daily needs. Therefore, I made the business judgment to continue with the Reimbursement System. In essence, the use of personal credit cards of the officers do not in substance differ than if the Debtor has been able to obtain corporate credit cards with similar credit limits—because, either way, the officers are personally liable for the charges.

10. In my business judgment, the costs associated are still outweighed by the benefits of the Reimbursement System. Furthermore, I still cannot find an alternative way to pay the many vendors that require credit or debit payments online.

11. The Debtor does use other methods of payment when available and makes more economic sense from a bookkeeping perspective. The Debtor does use ACH for those who accept it unless time is a factor since ACH takes longer to process. The Debtor also uses wires for vendors who bank with Wells Fargo because the wires are free and similarly fast like credit card payments. The Debtor also uses the company debit card for smaller transactions as the daily spending limit of the company debit card is $5,000.

12. To summarize, the Debtor's Reimbursement System of paying its AP on personal credit cards for reimbursement started somewhere between 2019 and 2021. The Debtor incorporated the use of Melio into the Reimbursement System around 2022. Thus, as of the Petition Date, the Reimbursement System has been an integral part of the Debtor's normal operations for several years. Post-petition, the Debtor continued with the Reimbursement System in the normal course as it has done over the last several years to pay post-petition and court-approved expenses.

13. The Reimbursement System necessarily generates a significant number of reimbursements made to the Debtor's officers. The reimbursements made by the Debtor through this Reimbursement System for the year prior to the Petition Date were disclosed in Section 4.1 and Addendum 2 of the Debtor's Statement of Financial Affairs ("SOFA," ECF No. 45).

14. Upon request, the Debtor has provided the U.S. Trustee with transaction backup for every expense reimbursement identified on Addendum 2 of the Debtor's SOFA.

15. The Reimbursement System is the ordinary course practice of the Debtor established long before the Debtor's bankruptcy filing.

16. Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury that the foregoing is true and correct."

EXECUTED November 28, 2025.

_____
James Noh