## __EXHIBIT A__

```
 1                    UNITED STATES BANKRUPTCY COURT
                      NORTHERN DISTRICT OF TEXAS
 2                        FT. WORTH DIVISION

 3                                )  CASE NO: 25-43950
                                  )
 4      ECUBE LABS CO.,           )  Ft. Worth, Texas
                                  )
 5              Debtor.           )  Monday, November 17, 2025
                                  )
 6                                )  3:03 p.m. to 3:46 p.m.
        ------------------------------)

 7

 8                      341 MEETING OF CREDITORS

 9                        BEFORE SUSAN HIRSH
                               TRUSTEE
10

11      APPEARANCES:

12      For Debtor:             J. BLAKE GLATSTEIN
                                Vartabedian Hester & Haynes LLP
13                              2200 Ross Avenue
                                Dallas, TX 75201
14
        For El Paso Disposal,   ALEXIS C. BEACHDELL
15      LP:                     SCOTT E. PRINCE
                                Baker & Hostetler
16                              127 Public Square
                                Cleveland, OH 44114
17
        Debtor's Representative: JAMES NOH
18
        Transcribed by:         Veritext Legal Solutions
19                              330 Old Country Road, Suite 300
                                Mineola, NY 11501
20                              Tel: 800-727-6396

21


22


23


24      Proceedings recorded by electronic sound recording;
        Transcript produced by transcription service.
25
```

 1          <u>FT. WORTH, TEXAS; MONDAY, NOVEMBER 17, 2025; 3:03 PM</u>

 2                          (Call to Order)

 3          MS. HERSH:  Okay, I'm going to go ahead and start

 4     the recording and start the meeting.  Just so everyone

 5     should know before going on the record, I want to make clear

 6     this is a 341 meeting and not intended to be a 2004

 7     examination.  So just we're going to ask Creditors to be

 8     mindful of that and if there's more specific questions and

 9     information they need and it's more appropriate in 2004,

10     then that's where they should take it.

11          Also to remind people that when they're not

12     speaking, if you could please leave your devices on mute,

13     but please do not put us on hold.  Some of you have very

14     pleasant music, but it does interfere with the recording.

15     When you do speak or ask any questions, I'll ask you to

16     please announce yourselves and also to whose behalf you're

17     appearing as we're making a record.

18          Today is Monday, November 17, 2025.  It is 3:03

19     p.m.  And just to remind you, this meeting is being

20     electronically recorded.  This is the first meeting of

21     creditors of Ecube Labs, LLC.  Case number 25-43950-MXM11.

22          My name is Susan Hersh.  I'm a trial attorney with

23     the Office of the United States Trustee and I will be the

24     presiding officer of this meeting.  This meeting is being

25     recorded.  Parties of interest may request a copy of the

1    audio after today.  Who will be testifying for the Debtor at

2    today's meeting?

3              MR. NOH:  That would be me, James Noh.

4              MS. HERSH:  And could you please spell your name

5    for the record?

6              MR. NOH:  J-A-M-E-S, N-O-H.

7              MS. HERSH:  Okay, and what is your capacity with

8    the Debtor?

9              MR. NOH:  As COO and CFO of Ecube Labs.

10             MS. HERSH:  All right.  And who is here

11   representing the Debtor today?

12             MR. GLATSTEIN:  Blake Glatstein with Vartabedian

13   Hester & Haynes.

14             MS. HERSH:  Okay, and have you -- have you met Mr.

15   Noh personally before and can you verify his identity?

16             MR. GLATSTEIN:  Yes, I have met him and yes, that

17   is him.

18             MS. HERSH:  Perfect, okay.  Mr. Noh, do you

19   understand that you're answering questions today and

20   testifying under penalty of perjury?

21             MR. NOH:  I do, yes.

22             MS. HERSH:  Okay, and if you'll raise your right

23   hand, I'm going to go ahead and swear you in.

24             MR. NOH:  Okay.

25             MS. HERSH:  All right.  Mr. Noh, do you swear or

1    affirm that the testimony you're about to give today in this

2    case under penalty of perjury will be true, complete, and

3    correct?

4         MR. NOH:  Yes, I do.

5         MS. HERSH:  Okay.  All right.  And are you aware

6    that as the whatever as the acting person for the Chapter 11

7    Debtor that there are obligations that you now owe that we

8    call fiduciary obligations?  Do you understand that?

9         MR. NOH:  Yes.

10        MS. HERSH:  Would you -- what is your

11   understanding of those obligations?

12        MR. NOH:  Do you mean specifically like to list

13   out all the fiduciary obligations?

14        MS. HERSH:  Well, let me see if I can make it a

15   little bit easier.  So, with respect to, are you familiar

16   with the fact that you're going to have obligations with

17   respect to the property of this Debtor and the revenue of

18   this Debtor and the money going forwards that you have

19   fiduciary obligations to the Creditors and the estate and

20   not to either an officer or a director or the owners?

21        MR. NOH:  Yes.

22        MS. HERSH:  Okay.  All right.  And can you tell me

23   a little bit about the Debtor's business and what led to the

24   bankruptcy filing?

25        MR. NOH:  Our business is primarily as a waste

1    broker.  We operate in several states throughout the U.S.

2    connecting businesses with haulers and haulers that provide

3    waste collection services.  We were in early -- in early or

4    around in April, beginning of April of 2024, we were sued by

5    Waste Connections and the following legal proceedings over

6    the course of the following year caused us to rack up quite

7    a lot of bills and legal fees and eventually we were unable

8    to continue to pay all of them, which led to this Chapter 11

9    organization.

10          MS. HERSH:  All right.  And what do you envision,

11   just in the most general terms, what do you envision a

12   reorganization plan looking like?

13          MR. NOH:  Well, we were very close to becoming

14   profitable before all of this happened.  So, I think with a

15   bit of effort and reorganization, we would be able to

16   continue to grow and turn a profit and use that profit to

17   pay back Creditors over time.

18          MS. HERSH:  Okay.  All right.  And is the Debtor

19   current on its post-petition operating expenses?

20          MR. NOH:  Yes, we are.

21          MS. HERSH:  Okay.  All right.  Does the Debtor

22   lease any of its premises?

23          MR. NOH:  Yes, we lease office space and a storage

24   yard.

25          MS. HERSH:  And is the Debtor current on those

1   obligations post-petition?

2         MR. NOH:  Yes.

3         MS. HERSH:  Okay.  Did the Debtor pay October rent

4   before filing?

5         MR. NOH:  Yes.

6         MS. HERSH:  Okay.  And has the Debtor pay November

7   rent?

8         MR. NOH:  Yes.

9         MS. HERSH:  All right.  And I know you just had a

10  big hearing where we went through this, but just for the

11  record today, I like to always ask this question.  Can you

12  tell me just approximately how much money the Debtor has on

13  hand now, Debtor's cash position?

14        MR. NOH:  As of right now, this minute or this

15  morning.

16        MS. HERSH:  Close enough.  However you want to

17  answer.

18        MR. NOH:  So currently we are sitting at around

19  $200,000.

20        MS. HERSH:  Okay.  Was it different this morning?

21        MR. NOH:  Yes.  It was closer to $400,000.

22        MS. HERSH:  Okay.  Okay.  And what bank accounts

23  is the Debtor using to make these payments?

24        MR. NOH:  We have four bank accounts, primarily

25  using the one ending in 8490 to make payments.

1              MS. HERSH:  8490.  And which bank is that at?

2              MR. NOH:  Wells Fargo.

3              MS. HERSH:  Okay.  Okay.  And was the Debtor using

4     the Wells Fargo account to pay its operating expenses prior

5     to filing?

6              MR. NOH:  Yes.

7              MS. HERSH:  And how does the Debtor primarily make

8     its payments?  Check, wire?

9              MR. NOH:  Primarily using credit cards, ACH wire,

10    those three.

11             MS. HERSH:  What do you mean credit cards?

12             MR. NOH:  Like credit, I mean, how else do I say

13    credit, like credit cards?  Cards.

14             MS. HERSH:  Whose credit cards?

15             MR. NOH:  My personal credit card.

16             MS. HERSH:  So, the Debtor primarily paid its

17    operating expenses using your personal credit card?

18             MR. NOH:  Yeah.  I mean, at this point, like until

19    recently, we didn't have like cash balance, right?  So, even

20    --

21             MS. HERSH:  I'm sorry you didn't --

22             MR. NOH:  -- before we did -- we did use -- it was

23    common practice for us to use a personal card to make

24    payments and then get reimbursed.

25             MS. HERSH:  I couldn't make out the first part of

1   your sentence.  You did it because until recently we didn't

2   have cash what?  Could you say that sentence again?

3             MR. NOH:  I'm sorry.  Are you --

4             MS. HERSH:  I'm trying --

5             MR. NOH:  You're a little bit fuzzy as well.

6             MS. HERSH:  Sure.  Fine.  I'm trying to understand

7   your sentence.  When I asked you why you use your personal

8   credit cards, why did the Debtor use your personal credit

9   cards to pay its operating expenses?

10            MR. NOH:  We've been -- we've been doing that

11  regularly for several years because we don't have a

12  corporate credit card.  We were unable to get a corporate

13  credit card.

14            MS. HERSH:  And how were you reimbursed?

15            MR. NOH:  From the account ending in 8490.

16            MS. HERSH:  And how often were you reimbursed?

17            MR. NOH:  There was no regular schedule.

18            MS. HERSH:  Okay.  About how often were you

19  reimbursed?  Daily?  Every couple days?

20            MR. NOH:  Some, you know, several times a week

21  sometimes.  It would depend.  There really was no regular

22  schedule.

23            MS. HERSH:  Okay.  So why couldn't -- and how did

24  the Debtor repay you by check or wire?

25            MR. NOH:  Wire.

1           MS. HERSH:  So why couldn't the Debtor pay its

2    vendors and suppliers and operating expenses directly?

3           MR. NOH:  Well, we wanted to pay by credit card

4    because there were certain protections by credit card

5    payments for us.  Also, our also only accept credit cards.

6    They won't accept wires because they're normally the way

7    they accept payments are from like regular customers who

8    don't wire in their payments.  So, they would accept usually

9    online payments.  And, yeah, I mean, there are a lot of

10   different reasons for using credit cards, but those are the

11   main ones.

12          MS. HERSH:  All right.  Why couldn't the Debtor

13   wire money to its major expenses whether they're a supplier

14   or a vendor?  Why wouldn't the Debtor just wire money

15   directly?

16          MR. NOH:  Just for the reasons I just stated.

17          MS. HERSH:  Okay.  All right.  Were all of the

18   reimbursements made -- were all of the reimbursements for

19   operating expenses put on personal credit cards reimbursed

20   from the Debtor from its Wells Fargo account?

21          MR. NOH:  Yes.

22          MS. HERSH:  Did you have any outstanding

23   reimbursements owed to you on the date of petition?

24          MR. NOH:  Yes, I did.

25          MS. HERSH:  And how much was that?

1              MR. NOH:  I don't recall exactly.

2              MS. HERSH:  Is the monies that are owed to you

3     listed on the Debtor's schedules on Schedule F?

4              MR. NOH:  Schedule F, no.

5              MS. HERSH:  Why not?

6              MR. NOH:  I didn't expect to get that money back.

7              MS. HERSH:  About how much do you think it is?

8              MR. NOH:  I would have to check, but I don't know.

9     I would have to check.  I really don't know right now.

10             MS. HERSH:  Is it over $10,000?

11             MR. NOH:  Yes, I believe so.

12             MS. HERSH:  Is it over $100,000?

13             MR. NOH:  I don't think so, no.

14             MS. HERSH:  Are there any other Creditors that

15    have been left off Schedule F that the Debtor owes?

16             MR. NOH:  No.

17             MS. HERSH:  And you don't own any interest in the

18    Debtor, is that correct?

19             MR. NOH:  That's correct.

20             MS. HERSH:  And has anybody or entity offered to

21    pay you for that outstanding reimbursement?

22             MR. NOH:  No.

23             MS. HERSH:  Why would you want to put millions of

24    dollars on your credit card for the Debtor's operating

25    expenses?

1        MR. NOH:  Like I said, it's not something that I

2   wanted to do necessarily.  It was just the only way we could

3   really do it at the time.  And it became common practice

4   because we just we were continually not able to open a

5   corporate credit card.  And our corporate debit cards had a

6   daily limit of $5,000, so it wasn't practical to pay through

7   Debtor cards.  So, it was the solution that we came up with

8   at the time, and it just became what we did.

9        MS. HERSH:  Okay.  Okay.  I realize that the

10  Debtor is owned by another entity, Ecube Lab  something, and

11  who are the ultimate owners of the parent?  Who are the

12  ultimate -- who are the individuals who ultimately own the

13  interest in the parent that owned the Debtor?  What are

14  their names?  And you may have to spell them for me.

15       MR. NOH:  So, the only one that I'm aware of is

16  Sun-beom Gwon the CEO.  I do know there are others.  I just

17  don't know all their names.

18       MS. HERSH:  Can you spell his name?

19       MR. NOH:  S-U-N-B-E-O-M.  Last name B-U --

20       MS. HERSH:  Wait, S-U-N, what's the fourth letter?

21       MR. NOH:  B as in (indiscernible).

22       MS. HERSH:  B-E-O-N, okay.

23       MR. NOH:  B-O-M, Mary at the end.

24       MS. HERSH:  B-O-M, okay.

25       MR. NOH:  B-E-O-M.

1           MS. HERSH:  B-E-O-M.

2           MR. NOH:  And last name is G-W-O-N, N as in Nancy.

3           MS. HERSH:  Okay, J-W-O-N (sic), Nancy.  Do you

4    have any other dealings, commercial interests with that

5    person?

6           MR. NOH:  No.

7           MS. HERSH:  Have you ever received any money from

8    this person or the parent?

9           MR. NOH:  You're talking about me personally,

10   right?

11          MS. HERSH:  For you personally, yes.

12          MR. NOH:  No.

13          MS. HERSH:  Okay.  All right, one more question.

14   How long have you been with the Debtor?

15          MR. NOH:  I'm sorry?

16          MS. HERSH:  How long have you been with the

17   Debtor?

18          MR. NOH:  Oh, since 2019.

19          MS. HERSH:  Okay.  Thank you.  Okay.  And I want

20   to thank you guys.  I think it looks like you've caught us

21   up with all our administrative stuff, the bank accounts, and

22   the insurance and all that stuff.  So, thank you very much.

23   And are you aware that the Debtor will be required to file

24   monthly operator reports?

25          MR. NOH:  Yes.

1            MS. HERSH:  Okay.  And you realize that the first

2    one is due, I think, next week?

3            MR. NOH:  Yes.

4            MS. HERSH:  For the month of October.  Okay.

5            MR. NOH:  On the first.

6            MS. HERSH:  Yes.  Excellent.  And have you had a

7    chance to review the United States Trustees' guidelines for

8    Debtors and Debtors in possession?

9            MR. NOH:  Yes.

10            MS. HERSH:  And do you understand from those

11    guidelines that in addition to the filing of quarterly

12    operating reports, there's also monthly quarterly fees that

13    are going to need to be paid?

14            MR. NOH:  Yes.

15            MS. HERSH:  All right.  And do you understand that

16    if the Debtor does not timely file the monthly reports for

17    quarterly fees that may be cause to dismiss or convert this

18    case?  Do you understand that?

19            MR. NOH:  Yes.

20            MS. HERSH:  Okay.  Great.  And I see that, turning

21    to employment of counsel, I see that counsel has filed their

22    application for employment.  Okay.  All right.  Have you

23    paid Debtors counsel?  When I say you, has the Debtor paid

24    any money to Debtor's counsel after the filing of this

25    bankruptcy?

1              MR. NOH:  No.

2              MS. HERSH:  Okay.  And just so you know that if

3     you -- that you're not to pay them without court authority

4     and a court order.  Do you understand that?

5              MR. NOH:  Understood, yes.

6              MS. HERSH:  Okay.  Do you anticipate hiring any

7     other professionals in this case, an accountant, brokers,

8     special counsel, anything like that?

9              MR. NOH:  Not at the moment, no.

10             MS. HERSH:  Okay.  And same thing.  If you go to

11    hire those types of professionals, you'll have to work with

12    your counsel to file an application for approval from the

13    bankruptcy court, okay?

14             MR. NOH:  Understood.

15             MS. HERSH:  All right.  Is the Debtor current on

16    its post-petition payroll?

17             MR. NOH:  Yes.

18             MS. HERSH:  All right.  And how many employees

19    does the Debtor have?

20             MR. NOH:  Six.

21             MS. HERSH:  Are they full-time?

22             MR. NOH:  Yes.

23             MS. HERSH:  Okay.  And are they all W-2 employees?

24             MR. NOH:  Yes.

25             MS. HERSH:  All right.  Is the Debtor current on

1    their payroll and the associated payroll taxes?  You're

2    making the deposits on time with them?

3              MR. NOH:  Yes.

4              MS. HERSH:  Excellent.  Okay.  Have you personally

5    or any related entity transferred money into this Debtor

6    since it's filed bankruptcy other than just collecting the

7    regular Debtor's revenue?

8              MR. NOH:  No.

9              MS. HERSH:  Okay.  All right.  And did you sign

10   the original petition in bankruptcy initiating this case?

11             MR. NOH:  Yes.

12             MS. HERSH:  All right.  Give me one second.  I'm

13   going to write something down before I forget.  Okay.  All

14   right.  And did you review -- I think you also filed the

15   schedules of assets and liabilities in this case.  They were

16   filed a Docket 44.  That's where the Debtor lists everybody

17   it owes money to and all the assets it owns.  Are you

18   familiar with that document?

19             MR. NOH:  Yes.

20             MS. HERSH:  Okay.

21             MR. NOH:  I'm sorry, your voice is fading --

22             MS. HERSH:  I'm sorry.  I'm not so close to the

23   phone.  Let me try that.  See if this is a little better.

24   So, the schedules of assets and liabilities, the Debtor

25   filed in a Docket 44.  Do you know what document I'm

1    referring to?

2              MR. NOH:  Yes, I do.

3              MS. HERSH:  Okay.  And did you have a chance to

4    review the schedules before signing them under penalty of

5    perjury?

6              MR. NOH:  Yes.

7              MS. HERSH:  And did you understand them?

8              MR. NOH:  Yes.

9              MS. HERSH:  And did you sign the schedules of

10   assets and liabilities before they were filed?

11             MR. NOH:  Yes.

12             MS. HERSH:  And did you list on these documents

13   everything that the Debtor owns, all of its assets?

14             MR. NOH:  Yes.

15             MS. HERSH:  And did you list everyone the Debtor

16   owes money to, I guess, except for you?

17             MR. NOH:  Yes.

18             MS. HERSH:  Okay.  Mr. Glatstein, I believe that

19   we need to amend the schedules to include all obligations

20   that the Debtor owes.

21             MR. GLATSTEIN:  Yes, I'm sorry.

22             MS. HERSH:  Other than that amendment, Mr. Noh,

23   are you aware of any other amendments that need to be made

24   to the schedules to make them -- other than that addition of

25   your name as a Creditor, Do you affirm that the schedules of

1    assets and liabilities are accurate, true, and correct?

2            MR. NOH:  Yes, I do.

3            MS. HERSH:  Okay.  We also have a document that

4    the Debtor filed called the statement of financial affairs.

5    It was filed at Docket Number 45.  Do you know what document

6    I'm referring to?

7            MR. NOH:  Yes.

8            MS. HERSH:  All right.  And did you review the

9    statement of financial affairs before signing them under

10   penalty of perjury?

11           MR. NOH:  Yes, I did.

12           MS. HERSH:  Okay.  And did you understand them?

13           MR. NOH:  Yes.

14           MS. HERSH:  Okay.  And did you sign the statement

15   of financial affairs before it was filed?

16           MR. NOH:  Yes.

17           MS. HERSH:  Are you aware of any amendments that

18   need to be made to this document?

19           MR. NOH:  No.

20           MS. HERSH:  So, do you affirm that the statement

21   of financial affairs is accurate, true, and correct?

22           MR. NOH:  Yes, I do.

23           MS. HERSH:  Okay.  And let's see you are the COO.

24   And you said you're also CEO?

25           MR. NOH:  CFO.

1             MS. HERSH:  I mean CFO, right.  Okay.  What is Mr.

2    Gwon's title?

3             MR. NOH:  VP Director of Sales.

4             MS. HERSH:  Okay.  What is your compensation?

5    What are you paid and how often are you paid it?

6             MR. NOH:  My income station is 180,000 and I paid

7    twice a month on the 15th and the last day.

8             MS. HERSH:  Okay.  And Mr. Gwon, what is his

9    compensation?

10            MR. NOH:  $150,000.

11            MS. HERSH:  And is he also paid on the 15th and

12   the last day of the month?  Mr. Noh?

13            MR. NOH:  Yes.

14            MS. HERSH:  Yes, he is.  He's paid on the 15th and

15   the last day of the month.

16            MR. NOH:  Yes.

17            MS. HERSH:  Okay.

18            MR. NOH:  Yes.  All six employees are paid the

19   same.

20            MS. HERSH:  Okay.  And I also see there's a Mr.

21   Wong O who's the CEO.  What is he paid?

22            MR. NOH:  $72,000.

23            MS. HERSH:  And what -- okay.  Are there -- were

24   all of you all paid -- let me say it the other way.  Were

25   any compensation owed to you guys prior to the bankruptcy

1   filing?

2          MR. NOH:  I'm sorry.  Was there any compensation

3   owed to us?

4          MS. HERSH:  Yeah.  In other words, were they

5   current -- was the Debtor current with your compensation

6   when it filed bankruptcy?

7          MR. NOH:  No.  So, like we filed on the 10th.  So,

8   we were still owed for the first through the 10th.

9          MS. HERSH:  Okay.  And have you been paid that

10  since?

11         MR. NOH:  Yes.

12         MS. HERSH:  Okay.  So, you're all caught up?

13         MR. NOH:  Yes.

14         MS. HERSH:  Okay.  Just have a couple -- a few --

15  just a few questions on the statement of financial affairs.

16  I'm going to look at that.  It's Document 45.  If you have

17  it in front of you, that would maybe make this a drop --

18  have it easier.

19         MR. NOH:  Okay.

20         MS. HERSH:  Okay.  Question 3.1.  It says it to

21  list the transfers made to Creditors or for the Debtor's

22  benefit within 90 days before filing bankruptcy.  Question

23  3.1.  This is a total amount of $44,000.  Do you see that?

24         MR. NOH:  Yes.

25         MS. HERSH:  Okay.  It says it references an

1    attachment Addendum 1.  Could you point me to which page

2    Addendum 1 is, please?

3            MR. NOH:  I'm sorry, I don't see it up here.

4            MS. HERSH:  I didn't either.

5            MR. GLATSTEIN:  I believe -- I believe Addendum 1

6    was inadvertently left off.

7            MS. HERSH:  Okay.  So can I -- I'll add that to --

8    find, I'll add that to the list of amendments.  Okay.  But I

9    wanted to make sure maybe I didn't see it.  I thought maybe

10   I may have missed it.  Okay.  If you turn to Page 11 of 21,

11   there's a question -- well, it actually starts on Page 10 of

12   21.  It's question 26D where you're supposed to list all

13   financial institutions and Creditors where you issued a

14   financial statement, and there's an answer that says on Page

15   11 of 21 that the financials were made available in virtual

16   data room to potential investors.  Do you see that?

17           MR. NOH:  Yes.

18           MS. HERSH:  Okay.  When was this information made

19   available?

20           MR. NOH:  I can't say exactly, but I know it was

21   sometime within the last two years, which is why I put that

22   in there.

23           MS. HERSH:  Okay.  And what was the intention with

24   this?  Why was the stuff put into a virtual data room?

25           MR. NOH:  We were trying to raise money.

1            MS. HERSH:  And what was in there?

2            MR. NOH:  In the data room?

3            MS. HERSH:  Yeah.

4            MR. NOH:  Our financials.  A deck explaining my

5    business.  Yeah, just a variety of investor requested

6    documents.

7            MS. HERSH:  And what were the results of that?

8    Did you raise any money?

9            MR. NOH:  No, we were unable to.

10           MS. HERSH:  How many people -- how many investors

11   visited the room approximately?

12           MR. NOH:  I would say a dozen.

13           MS. HERSH:  Okay.  When was the last time -- I'm

14   sorry.  Is that virtual data room still in existence?

15           MR. NOH:  No.

16           MS. HERSH:  When was it taken down?

17           MR. NOH:  It was sometime in 2024.

18           MS. HERSH:  Okay.  All right.  Have -- because I'm

19   about to open up the floor to Creditors, have any other

20   Creditors or parties in interest joined this call since I

21   asked for roll call at the beginning?  Anybody else come on?

22           MR. ROSENBERG:  Oh, yeah, sorry.  It's Josh

23   Rosenberg.  I was having trouble dialing in at the

24   beginning.

25           MS. HERSH:  Oh, no worries.  Before I turn it

1    over, I just had Mr. Noh, I just had a couple questions I

2    forgot about.  When you were talking about paying the

3    operating expenses through your person -- let me try again.

4    When you were testifying about the Debtor paying the

5    Debtor's operating expenses using your, Mr. Noh's, personal

6    credit card, I think you mentioned that some of the vendors

7    required like online payments, et cetera.  Is that right?

8              MR. NOH:  Correct, yes.

9              MS. HERSH:  Did the lawyers -- your law firms

10   require you to give your personal credit card -- I'm sorry.

11   Did the Debtor's lawyers require the Debtor to give Mr.

12   Noh's personal credit card to pay the Debtor's bills?

13             MR. NOH:  No, that was not required.

14             MS. HERSH:  Then why was it done?

15             MR. NOH:  To give us a little bit more room on

16   cash flow.

17             MS. HERSH:  But if the Debtor reimbursed you just

18   a few days later, how did that -- how did that alleviate

19   cash flow?  Couldn't the Debtor just have paid the legal

20   bill a day or two later?

21             MR. NOH:  I'm not sure exactly which transactions

22   you're referring to, but if they were repaid just a couple

23   days later, then that was most likely sent or paid via

24   credit card just because we paid all our expenses through

25   personal credit cards.  We don't send wires, especially to

1    like new vendors.  If we're set up through you know ACH for

2    automated payments, we can do that.

3            But usually, we don't send wires.  They cost

4    money, and just it's a -- like the process is -- it takes

5    much longer.  There's more record-keeping involved, and if

6    there's a mistake, it's like very hard to reverse.

7            MS. HERSH:  I just cannot tell you how unusual and

8    a little bit worrisome this is from a Chapter 11 standpoint.

9    But these legal bills look to be considerable.  If I look at

10   Addendum 2 to the statement of financial affairs, I haven't

11   added it up.  I didn't have time.

12           But out of the $9 million that looks like the

13   Debtor paid to you to reimburse you personally for the

14   Debtor's operating expenses, it's got to be several million

15   dollars on here for legal fees.  What would you estimate the

16   total legal fees are of this amount, of this $9 million?

17           MR. NOH:  A few million at least.

18           MS. HERSH:  Okay.  And $8 million at least.  And

19   why couldn't --

20           MR. NOH:  No, not eight, I said a few.

21           MS. HERSH:  Oh, a few.  Sorry.  Thank you.

22           MR. NOH:  So, two or three.

23           MS. HERSH:  Okay.  Thank you.  No, I appreciate

24   that.  Why couldn't the Debtor just have written a check?

25           MR. NOH:  For that amount?

1          MS. HERSH:  To pay the invoices.

2          MR. NOH:  Like I said, like there are several

3     payments throughout you know that time period.  It's a long

4     time period, so I couldn't say what the reason was for that

5     exact payment that you're referring to.  But like I said, we

6     try to pay everything using credit cards rather than wire.

7     That's just how we've always done it.  Oh, I'm sorry.  You

8     asked about paper checks.  We wouldn't write paper checks,

9     especially for that kind of amount.  We rarely used paper

10    checks.

11         MS. HERSH:  It's just so unusual.  People, you

12    know, we see hundreds and thousands of cases, and people

13    either pay their lawyers by a check, or they just wire to

14    their -- to their lawyers.  You know, Mr. Noh, do you

15    appreciate that now your credit card statements are part of

16    the Debtor's records of its payment of its operating

17    expenses?

18         MR. NOH:  I'm sorry.  I didn't get that last part.

19         MS. HERSH:  Do you understand now that your

20    personal credit card statements are part of the Debtor's

21    records for its payment of its operating expenses?

22         MR. NOH:  Do I -- do I understand that?

23         MS. HERSH:  Yes.

24         MR. NOH:  Yes.

25         MS. HERSH:  Okay.  And do you have all of your

1    credit card statements for the last two years that are

2    covered by -- oh, I'm sorry.  Hang on one second -- one

3    second.  For the last one year that are covered by this

4    addendum.

5         MR. NOH:  I have access to -- I don't have them on

6    me, but I have access to them, yes.

7         MS. HERSH:  Okay.

8         MR. NOH:  And we -- I have receipts and records

9    for all the payments on that addendum.

10         MS. HERSH:  Okay.  Thank you.  That'll be good.

11    Okay.  All right.  So, I don't know, Ms. Beachdell or Mr.

12    Prince, which one of you would like to ask questions?  But

13    would you like to ask some questions of Mr. Noh?

14         MS. BEACHDELL:  No, no questions.  Thank you.

15         MS. HERSH:  Okay.

16         MR. GLATSTEIN:  Ms. Beachdell and Ms. Hersh,

17    before you guys get started, just because I want to just

18    make sure that I set the tone right for the questioning from

19    here on out, is that you know there is a pending proceeding

20    going on related to this Debtor, and obviously anything that

21    goes to the Debtor's finances and its schedules and so forth

22    is fair game, but anything that's related to the claims and

23    the substantive nature of the pending proceeding, we are

24    going to object to, we're going to have a running objection

25    to, and we will instruct the witness not to answer.

1          MS. HERSH:  Okay.  Did you hear Ms. Beachdell said

2     that she has no questions?

3          MR. GLATSTEIN:  Oh, I did not.  I apologize.  I

4     thought she said she did have questions.  I apologize.

5          MS. BEACHDELL:  No, no questions.  Thank you.

6          MS. HERSH:  Mr. Rosenberg, do you have any

7     questions that you would like to ask Mr. Noh?  You're

8     welcome to.

9          MR. ROSENBERG:  I think I'm more in listening mode

10    at this juncture --

11         MS. HERSH:  That's totally fine.

12         MR. ROSENBERG:  -- so not at this moment in time -

13    -

14         MS. HERSH:  That's totally fine.

15         MR. ROSENBERG:  -- but probably will.

16         MS. HERSH:  Okay, that's totally fine.  Okay, so I

17    am -- okay, so I'm really concerned about the structure of

18    the payments and what was done for these Debtors.  So, I

19    think what I'm going to do is I think I'm going to continue

20    the meeting, and I'll find a date in a second.  I'm going to

21    send an email to Mr. Glatstein about some things we might

22    need, and then I may give you notice before then that we may

23    not have the meeting.  I'll just see how things go.

24              In the meantime, it looks like from this meeting

25    we've determined that the Debtor needs to amend its

1    schedules to correct Schedule F at least, and the statement

2    of financial affairs needs an Addendum 1.  Mr. Glatstein,

3    when do you think is a good time for me to put a deadline on

4    that so we can keep track?

5         MR. GLATSTEIN:  I'm sorry you cut out, Ms. Hersh.

6    I apologize.  I couldn't hear what you just asked.

7         MS. HERSH:  No worries.

8         MR. GLATSTEIN:  If that was geared towards me.

9         MS. HERSH:  Yeah, for the amendment to the

10   schedules and the amendment to the statement of financial

11   affairs.  Do you think that could be done in a week?

12        MR. GLATSTEIN:  The amendment to the schedule of

13   financial affairs can be done today.  It just needs to be --

14   I mean, like I can do it -- let's put it.  Yes, I can do it.

15   The both of them can be done in a week, yes, to answer your

16   question.

17        MS. HERSH:  Okay, that's fine.  So just I have to,

18   for my own sake, I just need to put a deadline on it and

19   hope, you know, to keep down before then.

20        MR. GLATSTEIN:  So, it's certainly over-promising

21   and under-over.

22        MS. HERSH:  No, it's good.  Fair enough.  No, it's

23   good for me to just have a place so I don't lose my mark.

24   Okay, so I'll put those on the 24th.  I'm going to continue

25   the meeting.  Let me just look at my calendar for a second,

```
 1   because this might be more problematic than I want it to be.

 2          Let me go -- let me check my calendar for just a

 3   minute.  If you would just hang on with me, I'd appreciate

 4   it one moment, okay?  Okay, I'm trying to look at the

 5   calendar and see what works.  Does December 8 work for you,

 6   Mr. Glatstein, and Mr. Noh, maybe in the afternoon?

 7          MR. GLATSTEIN:  It does work for me, yes.  Does it

 8   work for you, Mr. Noh?

 9          MS. HERSH:  Mr. Noh, is --

10          MR. NOH:  Yes, I'm good too.

11          MS. HERSH:  Okay, if that works for you, then I

12   think I'll go ahead and continue it until 12/8, and I'll

13   also do it at 3:00.  Okay, wonderful.  So, I'll continue it

14   until then.

15          Okay, so I'm going to go ahead and we're going to

16   adjourn the meeting for now.  We'll continue it until

17   12/8/25, and I will send an email to Mr. Glatstein for

18   anything else we may need in addition to the amendments we

19   spoke about today, okay?  Thank you, everybody.

20          MR. GLATSTEIN:  Okay, thank you.

21          MR. NOH:  Thank you.

22          MS. HERSH:  I'm going to stop the meeting and stop

23   the tape.  Thank you.

24          (Whereupon these proceedings were concluded at

25   3:46 PM)
```

```
 1                    C E R T I F I C A T I O N

 2

 3        I, Sonya Ledanski Hyde, certified that the foregoing

 4   transcript is a true and accurate record of the proceedings.

 5

 6

 7

 8

 9   Sonya Ledanski Hyde

10

11

12

13

14

15

16

17

18

19

20   Veritext Legal Solutions

21   330 Old Country Road

22   Suite 300

23   Mineola, NY 11501

24

25   Date:  November 24, 2025
```