



**CLERK, U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

# ENTERED

**THE DATE OF ENTRY IS ON**
**THE COURT'S DOCKET**

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed February 25, 2026**

**United States Bankruptcy Judge**

_____

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| ECUBE LABS CO., | § | Case No. 25-43950-mxm |
| | § | |
| Debtor. | § | |
| | § | |

**FINAL ORDER GRANTING DEBTOR'S MOTION FOR INTERIM AND FINAL**
**ORDERS (I) AUTHORIZING THE DEBTOR TO OBTAIN SECURED**
**POST-PETITION FINANCING; (II) SCHEDULING A FINAL**
**HEARING; AND (III) GRANTING RELATED RELIEF**

Came on for consideration the *Motion for Interim and Final Orders (I) Authorizing the*

*Debtor to Obtain Secured Post-Petition Financing; (II) Scheduling a Final Hearing; and (III)*

*Granting Related Relief* [Docket No. 48] (the "Motion") filed by Ecube Labs Co., the debtor-in-

possession in the above captioned chapter 11 bankruptcy case, seeking among other things, entry

of a final order (this "Final Order"), under sections 105, 363, 364(c)(1), (2) and (3), and 364(e) of

title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002 and 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Court Rules of the United States Bankruptcy Court for the Northern District of Texas (the "Local Bankruptcy Rules"): (i) authorizing the Debtor to obtain post-petition financing on a secured superpriority basis and granting related relief. The Court conducted an interim hearing on the Motion on November 14, 2025 ("First Interim Hearing"). On November 24, 2025, the Court entered the *Interim Order Granting Debtor's Motion for Interim and Final Orders (I) Authorizing the Debtor to Obtain Secured Post-Petition Financing; (II) Scheduling a Final Hearing; and (III) Granting Related Relief* [Docket No. 74] (the "First Interim Order") granting the Motion on an interim basis and authorizing interim borrowing of $500,000. On December 22, 2025, the Court held a second interim hearing on the Motion ("Second Interim Hearing"). On December 31, 2025, the Court entered the *Second Interim Order Granting Debtor's Motion for Interim and Final Orders (I) Authorizing the Debtor to Obtain Secured Post-Petition Financing; (II) Scheduling a Final Hearing; and (III) Granting Related Relief* [Docket No. 128] which authorized an additional interim borrowing of $500,000.

The Court having considered the aspects of the Motion and the exhibits attached thereto, evidence submitted at the First Interim Hearing and the Second Interim Hearing, arguments of counsel, and the Court finds in accordance with Bankruptcy Rules 2002, 4001(c) and Local Bankruptcy Rule 9014, due, proper and adequate notice of the Motion, the First Interim Hearing, and the Second Interim Hearing, appropriate to the circumstances presented having been given; the Debtor, the Waste Connections Parties, and the DIP Lender having agreed to the entry of this Final Order without the need of a final hearing; and it appearing that approval of final relief requested in the Motion is necessary to the Debtor and its bankruptcy estate, and all objections, if

any, to the entry of this Final Order having been withdrawn, resolved, or overruled by the Court; and after due and deliberate consideration and good and sufficient cause appearing therefor,

**THE COURT MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**

A. On October 10, 2025, the Debtor filed its voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "Petition Date"). The Debtor is operating its business and managing its property as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No creditors' committee has been appointed in this case.

B. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). The statutory predicates for the relief granted herein are sections 105 and 364 of the Bankruptcy Code and Bankruptcy Rule 4001(c). Venue of this chapter 11 proceeding and the Motion is proper in this district pursuant to 28 U.S.C. § 1408 and 1409.

C. The Debtor's business requires additional working capital on a post-petition basis and the Debtor has determined, in its business judgment, that it is unable to operate generally without obtaining post-petition financing. Without obtaining financing on a post-petition basis, the Debtor will not be able to pay necessary expenses so that it may continue operating to preserve and maintain the value of its assets.

D. Ecube Labs Co., Ltd. ("DIP Lender") has agreed to provide a post-petition debtor-in-possession credit facility ("DIP Facility") to the Debtor pursuant to the terms in the Debtor-In-Possession Term Loan Agreement ("DIP Loan Agreement") attached hereto as **Exhibit 1**. Reference is here made to the DIP Loan Agreement and other Loan Documents (as defined in the DIP Loan Agreement) for all purposes, and the terms thereof are incorporated herein.

3

E.     Subject to more detailed provisions of the DIP Loan Agreement, the terms of the DIP Facility are summarized as follows.  Capitalized terms that are not otherwise defined have the meanings given to them in the DIP Loan Agreement.

(i)     <u>Borrower</u>.  Ecube Labs Co.

(ii)     <u>DIP Facility Amount</u>.  Up to the amount of $1,500,000.00 subject to the entry of a Final Order ($500,000 authorized and funded upon entry of the First Interim Order, an additional $500,000 authorized and funded pursuant to the Second Interim Order, with an additional $500,000 available upon entry of the Final Order).

(iii)     Use of Proceeds.  The Debtor may use the proceeds of the DIP Facility (the "<u>DIP Loan</u>") to fund its working capital needs and administrative expenses of the bankruptcy estate, including professional fees, subject to and in accordance with the Budget or by consent of the DIP Lender; *provided, however,* that the Debtor shall provide counsel of record for the Waste Connections Parties with electronic mail notice of (a) a variance of ten percent (10%) or more in any line item of the Budget, (b) the addition or subtraction of any line item in the Budget, or (c) any change to how the Debtor calculates any line item in the Budget, in each case within ten (10) business days of any of (a)-(c) occurring.

(iv)     <u>Interest Rate</u>.  The DIP Loan will accrue interest from the date of the first advance at the greater of (a) the Prime Rate (as defined below) plus two and three quarters percent (2.75%) per annum, and such Interest Rate will be adjusted monthly with fluctuation in the Prime Rate, or (b) six percent (6%)

4

per annum. The "Prime Rate" shall mean the prime rate of interest as quoted in the most recently published issue of The Wall Street Journal (Central Edition) under the "Money Rates" table.

(v) Default Rate. A default interest rate ("Default Rate") will be applied at the maximum rate allowed by law. The Default Rate shall automatically accrue from and after the uncured Event of Default in the Loan Documents.

(vi) Term. The Facility shall terminate on the earlier of one (1) year after the date of the first advance, effective date of a plan, consummation of a sale of substantially all of the Debtor's assets under section 363 of the Bankruptcy Code, the Debtor's filing of a motion seeking to dismiss or convert to chapter 7, entry of an order converting the case to chapter 7 or for appointment of a trustee.

(vii) Maturity Date. Whichever is earlier of (a) effective date of a confirmed plan of reorganization, (b) sale of substantially all assets of the Debtor, (c) alternative DIP financing secured from another party, or (d) an uncured event of default.

(viii) Events of Default. The following shall constitute events of default of the DIP Facility except to the extent such event concurrently results in payoff in full of the DIP Loan: (a) if the DIP loan shall not have the priority contemplated by the DIP Loan Agreement; (b) disbursement not authorized under the Budget and not approved by the DIP Lender; (c) sale of substantially all of the assets of the Debtor without consent of the DIP Lender; (d) conversion of the Debtor's chapter 11 case to a case under

chapter 7; and (e) dismissal of the Debtor's chapter 11 case.  The Debtor shall have 30 days to cure any Event of Default.

(ix)   Loan Fees.  No Loan Fee will be charged in connection with the DIP Facility.  No penalty for early payment.

(x)   Expenses.  Borrower shall be responsible for all reasonable fees, costs and expenses of Lender up to $10,000, inclusive of any and all expenses of Lender's counsel, and shall reimburse such amounts promptly upon demand; subject to the terms of this Final Order, any additional reasonable fees, costs and expenses of Lender in excess of $10,000 shall be due upon repayment or maturity.

(xi)   Priority, Liens, Collateral.  The DIP Lender is granted a first lien ("DIP Liens") against all assets of any kind of the Debtor except the Excluded Assets (as defined below) ("DIP Collateral"). The DIP Liens granted to the DIP Lender shall not attach to (a) any causes of action pursuant to chapter 5 of the Bankruptcy Code and any recoveries or proceeds from the pursuit thereof; and (b) any commercial tort claims of the Debtor against the DIP Lender, the DIP Lender's insiders, and/or the Debtor's insiders, as such term is defined in section 101(31) of the Bankruptcy Code, and any recoveries or proceeds from the pursuit thereof (collectively, the "Excluded Assets"). Notwithstanding the foregoing, however, the Waste Connections Parties expressly reserve and may assert all defenses, claims, counterclaims, crossclaims, and other rights, including setoff, offset and recoupment, to any commercial tort claims of the Debtor against Waste Connections Parties

6

("Alleged Waste Connections Claims")[1], notwithstanding the granting of the DIP Liens against the Alleged Waste Connections Claims. The foregoing Excluded Assets and proceeds therefrom shall not be subject to any DIP Liens, shall not be DIP Collateral and shall not be used to repay the DIP Facility, the Superpriority DIP Claim (as defined below), or a DIP Lender general administrative claim.

(xii)   Carve-Out.  The DIP Liens and the Superpriority DIP Claim (as defined below) granted to the DIP Lender all are subject to a carve-out of funds for fees of professionals retained in the Debtor's chapter 11 case and for U.S.

F.   Trustee fees (see paragraph 9 below).  As disclosed in the *List of Equity Security Holders* [Docket No. 37], the DIP Lender is the Debtor's corporate parent holding 100% of the Debtor's outstanding common stock.

G.   The DIP Lender is willing to provide the DIP Facility only on a secured basis.

H.   The Debtor is unable to obtain unsecured or secured credit on terms superior to the proposed DIP Facility offered by the DIP Lender and is unable to obtain secured financing without granting the DIP Liens.  The DIP Lender is demonstrated to be able to most economically facilitate the Debtor's needs to utilize the chapter 11 process and is in the best interest of the Debtor's estate and its creditors.

I.   The DIP Facility has been proposed in good faith and is necessary to preserve the assets of the Debtor's bankruptcy estate.  The Court finds that the terms of the DIP Facility are fair, reasonable, and adequate given the circumstances of this case, and demonstrate the Debtor's

---

[1] Nothing in this order shall in any way alter, amend, modify, or change the Bar Date for filing proofs of claim for any party.

exercise of good faith sound business judgment.  The Debtor is therefore authorized to enter into the DIP Facility that is necessary to preserve the assets of its bankruptcy estate.

J.      The United States Trustee and the Waste Connections Parties provided informal comments to the Debtor which, by agreement of the Debtor, are incorporated into this Final Order as set forth below.

**ACCORDINGLY, IT IS HEREBY ORDERED AND ADJUDGED THAT:**

1.      **Motion Granted on a Final Basis**.  The Motion is **GRANTED** on a final basis on the terms set forth herein.

2.      **Authority to Enter into the DIP Facility.**  The Debtor is immediately authorized to enter into the DIP Facility upon the terms of the DIP Loan Agreement and execute the other Loan Documents contemplated therein.  The DIP Facility of up to $1,500,000 is hereby authorized on a final basis and the Debtor is authorized to borrow up to the full amount of the DIP Facility pursuant to the DIP Loan Agreement, the other Loan Documents and the terms of this Final Order.

3.      In the event of any conflict between the DIP Loan Agreement, the Loan Documents, or the terms of this Final Order, the terms of this Final Order shall control.  The DIP Loan Agreement and the other Loan Documents to be executed by the Debtor and the DIP Lender shall include, or shall be deemed to include, the following terms:

> (a)      The Default Rate (as defined in the DIP Loan Agreement) of interest shall commence accruing only after the expiration of any applicable cure period of an event of default and a lack of cure;

> (b)      Notwithstanding any other provision of this Final Order, the DIP Loan Agreement or the Loan Documents, actions taken by the Debtor necessary to fulfill its fiduciary duty as a debtor-in-possession shall not require the prior consent of the DIP Lender or constitute an event of default under the

DIP Loan Agreement or Loan Documents.  By way of example, the Debtor's *filing* of a motion to convert or dismiss this chapter 11 case shall not require the prior consent of the DIP Lender nor constitute an event of default; however, the entry of an order by this Court converting or dismissing this chapter 11 case may constitute an event of default under the Loan Documents.

(c)    Any expenses of the DIP Lender for which the DIP Lender requests to be paid by the Debtor shall be subject to the review by the United States Trustee and the Service Parties (as defined below).  The DIP Lender shall serve an itemized request for payment ("Expense Statement") by electronic mail on the Debtor, counsel for an official committee, if any, the United States Trustee, counsel for the Waste Connections Parties, and any other creditor that requests notice (the "Service Parties").  The Service Parties shall have ten (10) days from the service of an Expense Statement to object to the payment of any amount reflected on an Expense Statement by serving a written objection ("Objection") by electronic mail on counsel for the DIP Lender with a copy to counsel for the Debtor.  An Objection shall specify each item of expense objected to and the basis for the objection.  Any item not specifically objected to may be paid by the Debtor.  The DIP Lender shall be entitled to file a motion for payment with the Court in response to an Objection.

4.    **Security for DIP Loan**.  Pursuant to section 364(c)(2) and (3) of the Bankruptcy Code, DIP Lender shall be, and hereby is granted, effective immediately upon entry of this Final Order, valid and perfected security interest and liens in the DIP Collateral which shall not include

9

the Excluded Assets. The DIP Liens against the DIP Collateral shall be and hereby are determined to be perfected without the need for the execution or filing of any future document or instrument otherwise required to be executed or filed under applicable non-bankruptcy law. The Excluded Assets and proceeds therefrom shall not be subject to any DIP Liens and shall not be DIP Collateral. Further, for the avoidance of doubt, the Waste Connections Parties expressly reserve and may assert all defenses, claims, counterclaims, crossclaims, and other rights, including setoff, offset and recoupment, to such Alleged Waste Connections Claims, notwithstanding the granting of the DIP Liens on the Alleged Waste Connections Claims.

5. **Superpriority Administrative Claim**.  For the DIP Loan drawn under the DIP Facility (regardless of whether the draw was made pursuant to the First Interim Order, Second Interim Order, or this Final Order), for the benefit of itself, the DIP Lender is granted an allowed superpriority administrative expense claim pursuant to section 364(c)(1) of the Bankruptcy Code (the "Superpriority DIP Claim"), having priority in right of payment over any and all other obligations, liabilities and indebtedness of the Debtor, whether now in existence or incurred by the Debtor after the Petition Date, and over any and all administrative expenses or priority claims of the kind specified in, or ordered pursuant to, *inter alia*, sections 105, 326, 328, 331, 503(b), 507(a), 364(c)(1), 546(c), 726 or 1114 of the Bankruptcy Code; provided, however, that the Superpriority DIP Claim shall be subject to the DIP Liens and the Carve-Out.  Furthermore, the Excluded Assets and any proceeds of the Excluded Assets shall not be subject to or used to pay the DIP Facility, the Superpriority DIP Claim or a DIP Lender general administrative claim.

6. **Effectiveness of DIP Facility and DIP Loan**. From and after entry of this Final Order, the terms and conditions hereof shall be valid and binding upon and inure to the benefit of the Debtor and the DIP Lender for all purposes during this chapter 11 case, any subsequently converted case of the Debtor under chapter 7 of the Bankruptcy Code and any chapter 7 trustee

appointed, or after the dismissal of this chapter 11 case. No obligation, payment, transfer or grant of security under this Final Order shall be stayed, restrained, voidable, avoidable or recoverable under the Bankruptcy Code or under any appliable law (including without limitation, under sections 502(d), 548 or 549 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Voidable Transactions Act, Uniform Fraudulent Conveyance Act or similar statute or common law), or subject to any defense, reduction, setoff, recoupment or counterclaim.

7.      **Section 364(e)**.  The Court finds that the DIP Lender being the Debtor's sole corporate parent holding 100% of the outstanding common stock of the Debtor has been adequately disclosed to all parties in interest, the DIP Lender has acted in good faith in extending the credit provided by the DIP Facility, and the Debtor has demonstrated the exercise of good faith sound business judgment in seeking the DIP Facility.  Accordingly, DIP Lender shall be entitled to all protections pursuant to section 364(e) of the Bankruptcy Code to the fullest extent available.

8.      **Budget**.  Subject to the terms and conditions of this Final Order, the DIP Loan Agreement and the Loan Documents, the Debtor is authorized to use the proceeds of the DIP Facility and cash collateral (constituting part of the DIP Collateral) of the DIP Lender in accordance with the Budget attached hereto as **Exhibit 2,** or otherwise by consent of the DIP Lender; *provided, however,* that the Debtor shall provide counsel of record for the Waste Connections Parties with electronic mail notice of (a) a variance of ten percent (10%) or more in any line item of the Budget, (b) the addition or subtraction of any line item in the Budget, or (c) any change to how the Debtor calculates any line item in the Budget, in each case within ten (10) business days of any of (a)-(c) occurring.

9.      **Carve-Out**. Notwithstanding any other provision of this Final Order, the DIP Loan Agreement and the Loan Documents, the DIP Liens and the Superpriority DIP Claim granted to

11

the DIP Lender pursuant to this Final Order all are subject to a carve-out of funds (hereinbefore and hereinafter, the "Carve-Out") for the following administrative expenses: (a) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee pursuant to section 1930(a) of title 28 of the United States Code; and (b) all court approved fees and expenses of the Debtor's bankruptcy counsel in an amount up to $450,000.

10.     **Automatic Perfection of the DIP Liens**.  This Final Order shall be sufficient and conclusive evidence of the priority, perfection, validity, and enforceability of the DIP Liens upon the DIP Collateral granted to the DIP Lender as set forth in this Final Order, the DIP Loan Agreement, and the Loan Documents.  The DIP Lender shall not be required to file any financing statement, mortgage, deed of trust, assignments of rents, notice of lien, and/or any similar documents or take any other action (including possession of any of the DIP Collateral) in order to validate the perfection of the DIP Liens.  Notwithstanding the foregoing, DIP Lender is authorized, and the automatic stay lifted for this limited purpose, to file or record documents or instruments required to perfect the DIP Liens on the DIP Collateral under applicable non-bankruptcy law.

11.     **Events of Default; Remedies**.  Events of Defaults with respect to the DIP Facility and DIP Loan shall be those specified in this Final Order, the DIP Loan Agreement and the Loan Documents.  The Debtor may seek, and the DIP Lender consents to, an emergency hearing with no less than three (3) business days' notice, to challenge any notice of an Event of Default.  The DIP Lender shall be required to obtain relief from the automatic stay to exercise any remedies permitted under the DIP Loan Agreement or the Loan Documents against any property of the estate to effect repayment of the DIP Loan as a result of the occurrence of an uncured Event of Default. The Debtor shall provide the Service Parties with electronic mail notice of any Event of Default within one (1) business day of the receipt of a notice of an Event of Default. DIP Lender shall provide the Service Parties with electronic mail notice of any Event of Default concurrently with

providing such notice to the Debtor.   Any creditor identified on the Debtor's Schedule E/F and/or who has filed a proof of claim in this case and the U.S. Trustee shall have a right to challenge or oppose an alleged Event of Default or notice of default issued by the DIP Lender, including seeking an emergency hearing with no less than three (3) business days' notice.

12.     **No Stay**.  There is no stay of this Final Order, including no stay pursuant to Bankr.R.Proc. 6004(h) (to the extent applicable).

13.     **No Release**. For the avoidance of doubt, nothing in this Final Order, the First Interim Order, the Second Interim Order, the DIP Loan Agreement or the Loan Documents releases any claims the Debtor or any third party, including the Waste Connections Parties, may have or claim to have against the DIP Lender or the Debtor.

14.     This Court shall retain jurisdiction over any and all matters arising from or related to the implementation or interpretation of this Order.

**### End of Order ###**

# EXHIBIT 1

# DIP LOAN AGREEMENT

## Debtor-In-Possession Term Loan Agreement

February __, 2026

This Debtor-In-Possession ("DIP") Term Loan Agreement (this "Loan Agreement") dated as of February __, 2026, is between Ecube Labs Co., Ltd. ("Lender") and Ecube Labs Co. ("Borrower").

1.    Loan.  Borrower has agreed to borrow from Lender, and Lender has agreed to loan to Borrower, a principal sum not to exceed $1,500,000 ("Loan") subject to the terms and conditions stated in this Loan Agreement, the Loan Documents (as later defined) and the Final Order (as later defined).  Terms not defined in this Loan Agreement shall have the meaning as stated in the Loan Documents:

2.    Loan Documents.  As requested by Lender, Borrower agrees it will execute the following described documents representing, securing, evidencing or relating to the Loan, and Borrower further agrees to do all things reasonably necessary to ensure that all said documents remain outstanding and enforceable in accordance with their terms during the full term of the Loan. The documents shall be executed on the same day as the Loan Agreement and shall include (a) a Promissory Note ("Note") executed by Borrower and payable to the order of Lender in the amount of the Loan bearing interest (the "Interest Rate") at the greater of (i) the Prime Rate[1] plus two and three quarters percent (2.75%) per annum (such Interest Rate will be adjusted with fluctuation in the Prime Rate), or (ii) six percent (6%) per annum; (b) a Security Agreement executed by Borrower granting a security interest in the Collateral (as later defined) pledged by Borrower to secure payment of the Loan; (c) a UCC-1 Financing Statement ("Financing Statement") identifying the Collateral; and (d) such other documents including, without limitation, such orders of the Bankruptcy Court as may be reasonably required by Lender to secure and/or evidence the Loan (all such documents, this Loan Agreement, the Note, the Security Agreement, the Financing Statement and all other documents which may evidence, guarantee, or secure the Loan being referred to collectively as the "Loan Documents").

3.    Court Approval.  It is expressly agreed and understood this Loan Agreement and the Loan Documents are subject to entry of a "Final Order" granting the *Motion for Interim and Final Orders (I) Authorizing the Debtor to Obtain Secured Post-Petition Financing; (II) Scheduling a Final Hearing; and (III) Granting Related Relief* [Docket No. 43] (the "Motion") filed in the Borrower's chapter 11 bankruptcy case ("Bankruptcy Case") pending in the United States Bankruptcy Court for the Northern District of Texas, Fort Worth Division ("Bankruptcy Court"), case number 25-43950.  **The terms of the Loan Documents shall be, in all respects, subject to the terms of the Final Order**. **If there is a conflict between the terms of the Loan Documents and the terms of the Final Order, the terms of the Final Order shall govern.**

4.    Collateral.  To secure the full and timely payment of the Loan, Borrower grants a security interest in, and first lien on, all assets of Borrower, now owned or later acquired, whether or not earned by performance, all books and records pertaining thereto (including without limitation all manual and computer records, runs, printouts, disks, software and other computer-prepared information of every kind) and all insurance proceeds in connection therewith, together with all cash and non-cash proceeds and products thereof, wherever located, whether now owned or hereafter acquired or arising, *except, however*, the Collateral shall not include the Excluded Assets ("DIP Collateral"). The Excluded Assets shall include (a) all causes of action pursuant to chapter 5 of the Bankruptcy Code and any recoveries or proceeds from the pursuit thereof; and (b) all commercial tort claims of the Debtor against the Lender, the Lender's

---

[1] The "Prime Rate" shall mean the prime rate of interest as quoted in the most recently published issue of The Wall Street Journal (Central Edition) under the "Money Rates" table.  The Prime Rate is a reference rate and does not necessarily represent the lowest or best rate charged to any customer.

insiders, and/or the Debtor's insiders, as such term is defined in section 101(31) of the Bankruptcy Code, and any recoveries or proceeds recovered from the pursuit thereof.

5.      <u>Maturity Date</u>.  The entire principal balance of the Loan together with all accrued interest and other fees and expenses are due and payable in full on whichever is earlier of (a) effective date of a confirmed plan of reorganization in the Bankruptcy Case, (b) sale of substantially all of the assets of the Borrower, or (c) Borrower obtains alternative DIP financing from another party.  There shall be no penalty for early payment.

6.      <u>Expenses of Lender</u>.  Borrower agrees to pay reasonable out-of-pocket cost and expenses incurred by Lender in connection with the Loan, including, without limitation, reasonable attorneys' fees.  Subject to the procedures set forth in the Final Order, Borrower shall be responsible for expenses of Lender up to $10,000, including costs and expenses of Lender's counsel and shall reimburse Lender such amounts promptly upon demand; any additional costs and expenses of Lender above $10,000 shall be due upon repayment or maturity of the Loan.

7.      <u>Use of Loan Proceeds</u>.  The proceeds of the Loan are to be used exclusively for general working capital and bankruptcy professional fees of Borrower and fees due the United States Trustee. Requests for loan advances by Borrower must be made in writing to Lender by an authorized officer of Borrower who is authorized to request such advances.  Notwithstanding anything stated in this Loan Agreement to the contrary, in no event shall Lender be obligated to make an advance to Borrower that when added to the outstanding principal balance of all previous advances, exceeds the full amount of the Loan. The obligation of Lender to make the Loan in this Loan Agreement shall be subject to the prior or simultaneous occurrence or satisfaction of each (unless expressly waived in writing by Lender) of the following conditions:

>       (a)     Lender shall have received from Borrower all the Loan Documents requested by the Lender that have been duly executed by Borrower, and the Loan Documents shall remain outstanding and enforceable in accordance with their terms, all as required in this Loan Agreement;

>       (b)     The representations and warranties set forth in Paragraph 7 in this Loan Agreement shall be true and correct in all material respects as of the date of this Loan Agreement;

>       (c)     Lender shall have received evidence satisfactory to it of the authority of Borrower to execute and deliver the Loan Documents and to consummate the transactions contemplated in this Loan Agreement and of the authority of the person or entity acting on behalf of Borrower with respect to the execution and delivery of the Loan Documents to so act; and

>       (d)     Borrower shall have obtained orders of the Bankruptcy Court authorizing the Loan on (i) an interim basis in an amount of up to $1,000,000.00, and (b) a final basis up to a total of $1,500,000.00.

8.      To induce Lender to make the Loan, Borrower does represent, warrant, and covenant to Lender that:

>       (a)     Borrower is a duly organized and validly existing corporation under the laws of the State of Delaware;

>       (b)     Borrower has full power and authority to enter into and perform its obligations under the Loan Documents, including the borrowing contemplated in this Loan Agreement, and the Loan Documents will have been duly executed and delivered by the Borrower and will constitute the valid and binding agreements of, and will be enforceable against, Borrower in accordance with their terms, except as limited by bankruptcy, insolvency and other laws of the State of Texas;

(c)       Neither the execution of the Loan Documents nor the consummation of the transactions contemplated in the Loan Documents will (i) constitute a breach of, or a default under, any mortgage, deed of trust, lease, bank loan or other credit agreement, contract, instrument or agreement to which Borrower is a party or by which Borrower may be bound or affected, or (ii) violate or contravene any provision of any instrument creating or governing the business operations of Borrower;

(d)       To the best of Borrower's knowledge, no Event of Default (as defined in Paragraph 10 below) has occurred and is continuing, and no event has occurred and is continuing which, with notice or the passage of time or both, would constitute an Event of Default.

9.       So long as any portion of the Loan is outstanding, Borrower shall, in addition to all other covenants and agreements contained in this Agreement and the other Loan Documents:

(a)       Maintain its corporate existence and good standing in its jurisdiction of incorporation, and Borrower shall maintain in force all necessary licenses, approvals, and agreements;

(b)       To the extent applicable, Borrower shall meet the minimum funding requirements of ERISA with respect to any employee benefit plans subject to ERISA, and Borrower shall comply with all statutes, laws, ordinances and government rules and regulations to which it is subject, noncompliance with which could have a material adverse effect;

(c)       Borrower shall make due and timely payment or deposit of all material post-petition taxes required of it by law (including the Bankruptcy Code), provided that the Borrowers need not make any payment if  the amount or validity of such payment is contested in good faith by appropriate proceedings and is reserved against (to the extent required by GAAP) by Borrower and  the failure to make payment pending such contest could not reasonably be expected to result in a material adverse effect;

(d)       At any time and from time to time, the Borrower shall execute and deliver such further instruments and take such further action as may reasonably be requested by Lender to affect the purposes of this Loan Agreement;

(e)       In connection with a sale in the Bankruptcy Case, request that the bidding procedures for such sale require each bid to assign value to each portion of Collateral owned by Borrower, and  notwithstanding the foregoing, subject to applicable law, regardless of how the purchase price is allocated, that the sale proceeds of the Collateral shall first be used to pay in full the obligations owing to the Lender as of the date of the closing of the sale to the extent of the value of Lender's liens on the sold Collateral;

(f)       Borrower shall comply in a timely manner with its obligations and responsibilities as a DIP under the Bankruptcy Code, the rules of procedure of the Bankruptcy Court, and orders of the Bankruptcy Court; and

(g)       Borrower shall not incur, create, assume, suffer to exist, or permit any other Superpriority Claim that is *pari passu* with or senior to the claims of the Lender against Borrower, except for the Carve Out, and as otherwise expressly stated in the Final Order.

10.       Other than in accordance with a bankruptcy sale order or a plan of reorganization confirmed by the Bankruptcy Court, the Borrower shall not do any of the following:

(a)      Convey, sell, lease, transfer or otherwise dispose of any property (collectively, a "Transfer") other than Transfers of (a) non-exclusive licenses and similar arrangements for the use of the property (including Intellectual Property) in the ordinary course of business, (b) licenses that could not result in a legal transfer of title of the licensed property but that may be exclusive in respects other than territory, (c) the Transfer or sale of the Borrower's goods and inventory in the ordinary course of business, or Transfers as permitted by this Loan Agreement or the order(s) of the Bankruptcy Court;

(b)      Engage in any business, other than the businesses currently engaged in by the Borrower and any business substantially similar or related to the Borrower's current business (or incidental to it), or cease to conduct business in the manner conducted by the Borrower, or, without thirty (30) calendar days prior written notification to Lender, (i) relocate its chief executive office or state of incorporation or change its legal name, or (ii) add any new offices or business locations or deliver any portion of the Collateral valued.

(c)      Merge, divide or consolidate, with or into any other business organization, or acquire, all or substantially all the capital stock or property of another person.

(d)      Create, incur, guarantee, assume or be or remain liable with respect to any indebtedness, other than permitted indebtedness approved by the Bankruptcy Court.

(e)      Create, incur, assume or suffer to exist any lien with respect to any of its property, or assign or otherwise convey any right to receive income, including the sale of any accounts or enter into any agreement with any person other than Lender, and not to grant a security interest in, or otherwise encumber, any of its property with equal or higher priority to Lender's liens.

11.      The occurrence of any of the following shall constitute an "Event of Default" under this Loan Agreement and the Loan Documents, entitling Lender to exercise any and all rights and remedies for default specified in this Loan Agreement and Loan Documents at law or in equity:

(a)      The occurrence of a Default or an Event of Default under any of the Loan Documents (defined in such documents as "Default" or "Event of Default");

(b)      If any of the representations of Borrower contained in this Loan Agreement or in any other Loan Document are or become untrue or incorrect in any material respect;

(c)      If Borrower fails or neglects to perform or observe any other material term, provision, condition, covenant contained in this Loan Agreement, in any of the Loan Documents;

(d)      If there occurs, and is ongoing, any circumstance or circumstances that could reasonably be expected to have a material adverse effect, and, solely to the extent such circumstance can be cured, the Borrower fails to effectuate such cure to Lender's reasonable satisfaction within thirty (30) days (or such other additional time agreed to by the Lender) after receipt of written notice from Lender delivered to the Borrower;

(e)      Other than in connection with the Bankruptcy Case, if any material portion of the Borrower's assets are attached, seized, subjected to a writ or distress warrant, or are levied upon, or come into the possession of any trustee, receiver or person acting in a similar capacity and such attachment, seizure, writ or distress warrant or levy has not been removed, discharged or rescinded within ten (10) calendar days, or if the Borrower is enjoined, restrained, or in any way prevented by court order from continuing to conduct all or any material part of its business affairs, or if a judgment or other claim becomes a lien or encumbrance upon any material portion of the

Borrower's assets, or if a notice of lien, levy, or assessment is filed of record with respect to any material portion of the Borrower's assets by the United States Government, or any department, agency, or instrumentality thereof, or by any state, county, municipal, or governmental agency; *provided, however*, that none of the foregoing shall constitute an Event of Default where such action or event is stayed or an adequate bond has been posted pending a good faith contest by the Borrower (provided that no advances will be required to be made during such cure period); *and further provided that* enforcement of the prepetition preliminary injunction entered in the litigation pending between Borrower and the Waste Connections Parties[1] shall not be deemed an Event of Default;

(f)      Except to the extent the counterparty would be stayed from exercising remedies as a result of the Bankruptcy Case, if there is a default or other failure to perform in any agreement to which the Borrower is a party or by which it is bound resulting in a right by a third party or parties, whether or not exercised, to accelerate the maturity of any indebtedness in an amount in excess of Two-Hundred Fifty Thousand Dollars ($250,000.00) or which could reasonably be expected to have a material adverse effect;

(g)      If the Loan shall not have the priority contemplated by this Loan Agreement appended as Exhibit 1 to the Final Order, or the entry of any order in the Bankruptcy Case avoiding or requiring repayment of any portion of the payments made on account of the Loan; *provided*, in such event, Lender shall provide the Borrower and the U.S. Trustee written notice that an Event of Default for breach of this Section 10(g) has occurred;

(h)      If a judgment or judgments for the payment of money in an amount, individually or in the aggregate, of at least Two-Hundred Fifty Thousand Dollars ($250,000.00) (excluding amounts covered by insurance or third party indemnification) shall be rendered against the Borrower and shall remain unsatisfied, unvacated or unstayed pending appeal for a period of ten (10) calendar days (*provided that* no advances will be made prior to the satisfaction or stay of such judgment); *provided, however*, this subsection shall not apply to prepetition claims against the Debtor in the Bankruptcy Case;

(i)      If any material misrepresentation or material misstatement exists in any warranty or representation set forth in this Loan Agreement or in any certificate delivered to Lender by any responsible officer pursuant to this Loan Agreement or to induce Lender to enter into this Agreement or any other Loan Document; *provided, however*, in such event Lender shall provide the Borrower, the U.S. Trustee and the Waste Connections Parties with written notice that an Event of Default for breach of this Section 10(i) has occurred;

(j)      The Bankruptcy Case shall be dismissed or converted into a case under Chapter 7 of the Bankruptcy Code;

(k)      A trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code or an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code is appointed in the Bankruptcy Case;

(l)      The Bankruptcy Court shall enter an order or orders granting relief from any stay of proceeding (including, the automatic stay applicable under Section 362 of the Bankruptcy Code to the holder or holders of any security interest) to (i) permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of the Borrower which have a value in excess of Two-Hundred Fifty Thousand Dollars ($250,000.00) in the aggregate, or (ii) permit other actions

---

[1] El Paso Disposal, LP, Waste Connections of Texas, LLC, Waste Connections Lone Star, Inc., and Waste Connections US, Inc. (collectively, the "Waste Connections Parties").

that would have a material adverse effect on the Borrower or its estate; *provided, however*, that a determination on the Waste Connections Parties' motion for relief from stay shall not be deemed an Event of Default;

(m)     The Final Order (on and after the Final Order entry date) shall cease to create a valid and perfected first priority Lien on the Collateral or to be in full force and effect, shall have been in any material respect reversed, modified, amended, stayed, vacated, or subject to stay pending appeal, without prior written consent of Lender; *provided, however*, in such event Lender shall provide the Borrower, the U.S. Trustee and the Waste Connections Parties written notice that an Event of Default for breach of this Section 10(m) has occurred.

(n)     Except as permitted in the Final Order, the entry of any order of the Bankruptcy Court granting to any third party a superpriority claim or lien on the Collateral or any of the Borrower's assets without the prior written consent of Lender (which consent shall not be unreasonably withheld); and

(o)     Any suit or action commenced against the Lender by the Borrower that constitutes a challenge or that asserts a claim or seeks a legal or equitable remedy that would have the effect of subordinating the claim or Lien of the Lender.

12.     <u>Opportunity to Cure</u>.  If Lender believes an Event of Default has occurred, it shall provide written electronic mail notice delivered to Borrower, the U.S. Trustee, and bankruptcy counsel to the Waste Connection Parties providing notice of the occurrence of an Event of Default.  Borrower shall have thirty (30) days from the date of the receipt of the written notice to cure such default.  *Provided, however*, if the default cannot be cured within the thirty-day period but such default is likely to be cured within a reasonable time, then the Borrower shall have an additional reasonable period (which shall not in any case exceed an additional thirty (30) days) to attempt to cure such default.  Within such reasonable additional time period, the failure to cure such default shall not be deemed an Event of Default, but no credit extensions will be made without further agreement in writing by both parties and permission of the Bankruptcy Court. The Bankruptcy Court shall have jurisdiction to resolve any dispute between the Borrower and Lender regarding whether an Event of Default has occurred and is ongoing

13.     <u>Default Rate</u>.  If an Event of Default remains uncured after the expiration of the applicable cure period provided in this Loan Agreement, a default rate of interest ("<u>Default Rate</u>") shall apply to the unpaid principal balance of the Loan beginning the day after the last day of the applicable cure period.  The Default Rate shall be the highest rate permitted by law.

14.     <u>Remedies</u>.  If an Event of Default occurs under this Loan Agreement or any of the other Loan Documents, and after written notice by Lender of such default, such Event of Default remains uncured after the expiration of applicable cure periods provided in this Loan Agreement or in the Loan Documents, then Lender may, at its option, declare the unpaid principal balance of, and the accrued and unpaid interest on the Loan, immediately due and payable and may foreclose all liens and security interests securing payment of the Loan, pursue any and all other rights and remedies available to Lender or pursue any combination of the foregoing.  All remedies under this Loan Agreement, the Loan Documents, and at law or in equity shall be cumulative.  *Notwithstanding the foregoing, however,* Lender is required, pursuant to the Final Order, to obtain relief from the automatic stay prior to exercising its rights to the remedies provided herein.

15.     This Loan Agreement is not assignable by Borrower without the prior written consent of Lender, and any attempt at assignment without such consent shall be null and void and shall be of no force and effect. This Loan Agreement shall be binding upon, and shall inure to the benefit of, the heirs, legal representatives, personal representatives, successors and assigns of the parties to this Loan Agreement.

16.     This Loan Agreement may not be amended, modified, or changed orally, but may be amended, modified, or changed only by an instrument executed in writing by the parties to this Loan Agreement.

17.     Any clause, sentence, paragraph, section or provision of this Loan Agreement held by a court of competent jurisdiction to be invalid, illegal, or ineffective shall not impair, invalidate, or nullify the remainder of this Loan Agreement, but rather the effect on such ruling shall be confined to the clause, sentence, paragraph, section or provision so held to be invalid, illegal or ineffective, and this Loan Agreement shall be construed as if such invalid, illegal or ineffective provisions had never been contained in this Loan Agreement.

18.     This Loan Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

19.     In the event the enforceability or validity of any provision of this Loan Agreement, or of any of the Loan Documents, is challenged or questioned, such provision shall be construed in accordance with, and shall be governed by, whichever applicable Federal or Texas law would uphold or enforce such challenged or questioned provision.

20.     The other Loan Documents are not intended to supersede the provisions of this Loan Agreement but shall be construed as supplemental to this Loan Agreement. In the event of any inconsistency between the provisions of the other Loan Documents and this Agreement, or in the event the provisions in the other Loan Documents are not as complete or clear as this Loan Agreement, this Loan Agreement shall control. In the event of any conflict between this Loan Agreement, the other Loan Documents, the First Interim Order, the Second Interim Order, or the terms of the Final Order, the terms of the Final Order shall control.

21.     THIS LOAN AGREEMENT HAS BEEN EXECUTED UNDER, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF TEXAS, EXCEPT AS SUCH LAWS ARE PREEMPTED BY APPLICABLE FEDERAL LAWS.

22.     ALL OBLIGATIONS CONTAINED IN THIS LOAN AGREEMENT OR ARISING UNDER THE LOAN DOCUMENTS ARE EXPRESSLY PERFORMABLE IN TARRANT COUNTY, TEXAS. VENUE OF ANY LITIGATION INVOLVING THE LOAN DOCUMENTS SHALL BE MAINTAINED IN THE BANKRUPTCY COURT.

**THIS WRITTEN LOAN AGREEMENT AND ANY WRITTEN DOCUMENTS ATTACHED TO THIS LOAN AGREEMENT AND/OR EXECUTED IN CONNECTION WITH THIS LOAN AGREEMENT REPRESENT THE FINAL AGREEMENT AMONG THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS AMONG THE PARTIES.**

(THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK)

**LENDER:**

**Ecube Labs Co., Ltd.**

By: _____

 Name:

 Title:

Accepted and agreed effective February __, 2026.

**BORROWER:**

 **Ecube Labs Co.**

By: _____

 Name: James Noh

 Title: Chief Operating Officer / Chief Financial
 Officer

**EXHIBIT 2**

**BUDGET**

**BUDGET**

| CASH BASIS | Mar 1 | Mar 2 - 8 | Mar 9 - 15 | 22 | 29 | Apr 5 | Apr 6 - 12 | Apr 13 - 19 | Apr 20 - 26 | Apr 27 - May 3 | May 4 - 10 | May 11-17 | May 18-24 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| STARTING CASH | $351,881 | $314,406 | $373,356 | $469,756 | $375,051 | $417,546 | $338,326 | $398,126 | $271,421 | $283,516 | $171,406 | $240,726 | $225,191 |
| **INFLOW** | | | | | | | | | | | | | |
| Haulla Revenue (Stripe) | $30,000 | $460,000 | $160,000 | $50,000 | $40,000 | $470,000 | $160,000 | $50,000 | $40,000 | $0 | $480,000 | $160,000 | $50,000 |
| Haulla Revenue (Checks) | $28,750 | $29,000 | $29,250 | $29,500 | $29,750 | $30,000 | $30,250 | $30,500 | $30,750 | $36,000 | $36,500 | $37,000 | $30,500 |
| DIP Loan | | | $500,000 | | | | | | | | | | |
| TOTAL INFLOW | $58,750 | $489,000 | $689,250 | $79,500 | $69,750 | $500,000 | $190,250 | $80,500 | $70,750 | $36,000 | $516,500 | $197,000 | $80,500 |
| **OUTFLOW** | | | | | | | | | | | | | |
| Past-due Haulla COGS | $0 | $400,000 | $0 | $0 | $0 | $410,000 | $0 | $0 | $0 | $0 | $420,000 | $0 | $0 |
| Haulla COGS | $0 | $0 | $100,000 | $100,000 | $0 | $0 | $100,000 | $100,000 | $0 | $0 | $0 | $100,000 | $100,000 |
| Liquidated Damages | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 |
| Auto Expense | $240 | $240 | $240 | $240 | $240 | $240 | $240 | $240 | $240 | $240 | $240 | $240 | $240 |
| Administrative | $900 | $900 | $900 | $900 | $900 | $900 | $900 | $900 | $900 | $780 | $780 | $780 | $900 |
| Bank Service Charges | $500 | $500 | $500 | $500 | $500 | $500 | $500 | $500 | $500 | $500 | $500 | $500 | $500 |
| Filing Fee | $0 | $0 | $400 | $0 | $0 | $200 | $0 | $1,400 | $0 | $600 | $200 | $200 | $0 |
| Insurance | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Outside Service | $2,500 | $3,000 | $3,000 | $3,000 | $0 | $5,500 | $3,000 | $8,500 | $0 | $0 | $3,000 | $3,000 | $3,000 |
| Employee Salaries | $28,000 | $0 | $28,000 | $0 | $0 | $28,000 | $28,000 | $0 | $28,000 | $28,000 | $0 | $0 | $0 |
| Benefits | $0 | $0 | $3,400 | $0 | $0 | $3,400 | $0 | $3,400 | $0 | $0 | $0 | $3,700 | $0 |
| Postage & Delivery | $250 | $250 | $250 | $250 | $250 | $250 | $250 | $250 | $300 | $300 | $300 | $300 | $250 |
| Accounting Fees | $5,000 | $0 | $0 | $0 | $0 | $5,000 | $0 | $0 | $5,000 | $5,000 | $0 | $0 | $0 |
| Rents | $0 | $0 | $4,000 | $0 | $0 | $0 | $0 | $4,000 | $0 | $0 | $0 | $4,000 | $4,000 |
| Repairs & Maintenance | $1,000 | $0 | $0 | $0 | $0 | $1,000 | $0 | $1,000 | $0 | $1,000 | $0 | $0 | $0 |
| Supplies | $160 | $160 | $160 | $160 | $160 | $160 | $160 | $160 | $160 | $160 | $160 | $160 | $160 |
| Taxes & Licenses | $0 | $0 | $0 | $44,000 | $0 | $0 | $0 | $45,000 | $0 | $0 | $0 | $46,000 | $45,000 |
| Telephone / Internet / Fax | $955 | $0 | $0 | $155 | $205 | $155 | $0 | $155 | $205 | $750 | $0 | $155 | $155 |
| Tools & Parts | $220 | $0 | $0 | $0 | $205 | $750 | $0 | $205 | $0 | $280 | $0 | $0 | $0 |
| Travel | $1,000 | $0 | $0 | $0 | $1,000 | $220 | $1,000 | $0 | $1,000 | $1,000 | $0 | $0 | $0 |
| Warranty Expense | $500 | $0 | $0 | $500 | $0 | $500 | $0 | $0 | $1,000 | $1,000 | $0 | $0 | $0 |
| Legal Fees | $0 | $0 | $430,000 | $0 | $0 | $100,000 | $0 | $0 | $0 | $75,000 | $0 | $0 | $0 |
| UST Quarterly Fees | $30,000 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $30,000 | $0 | $0 | $0 | $0 |
| TOTAL OUTFLOW | $96,225 | $430,050 | $592,850 | $174,205 | $27,255 | $579,220 | $130,450 | $207,205 | $58,655 | $148,110 | $447,180 | $212,535 | $179,205 |
| ENDING CASH | $314,406 | $373,356 | $469,756 | $375,051 | $417,546 | $338,326 | $398,126 | $271,421 | $283,516 | $171,406 | $240,726 | $225,191 | $126,486 |